**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JOSEPH VASTA, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No.: 06-396-ML-DLM |
| BANC OF AMERICA INVESTMENT SERVICES, INC., | ) | **ORAL ARGUMENT REQUESTED** |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

BANC OF AMERICA INVESTMENT SERVICES, INC.

By its attorneys,

Mark A. Pogue (#3341)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

Alice A. Kokodis (*pro hac vice*)
Brian P. Pezza (*pro hac vice*)
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 439-4444

Defendant Banc of America Investment Services, Inc. ("BAI" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56, respectfully submits this Memorandum of Law In Support Of Its Motion For Summary Judgment (the "Motion") on all counts of the Complaint brought by plaintiff Joseph Vasta ("Vasta" or "Plaintiff") against BAI as well as on the Counterclaims brought by BAI against Vasta.

## I. INTRODUCTION

After 16 weeks of medical leave, Vasta returned to his position as a financial advisor in BAI's Rhode Island Market on September 19, 2005. In the weeks that followed, Vasta increasingly began to "work from home," even though he never sought permission to do so and failed to notify his supervisor or BAI administration of his plans. His absence was particularly curious to BAI, since he left his company laptop at his Providence office (severing his access to BAI's computer system), he never set-up his BAI voicemail and he left behind his investment customers' files. By November 10, 2005, Market Director Lou Garofano ("Garofano") realized that he had not seen Vasta in some time. Garofano left Vasta a voice message on Vasta's business line and asked Administrative Assistant Caryn Hodges ("Hodges") to review Vasta's recent transactions and customer contacts. Hodges found that Vasta had not entered a single customer contact into BAI's system and had only been credited with a handful of transactions since his return from leave. On November 15, 2005, after another five days had passed without Garofano or Hodges seeing Vasta in the office, BAI concluded that Vasta had abandoned his position

Even before Vasta left his job, he was consistently one of the lowest-producing financial advisors in the Rhode Island Market. He was hired with great expectations in 2004 of generating $400,000 per year in revenue. In his first year he did not bring in a quarter of that amount.

Starting in December 2004, Vasta's production was so low that he began to develop a deficit between the $2,000 per month recoverable draw BAI paid him and his meager commissions. This deficit continued to grow until his departure, at which point it had reached the sum of $11,363.88. BAI policy – which is consistent with Vasta's 30-years of experience in the industry – provides that he must repay the full deficit upon leaving BAI.

Vasta filed a charge of discrimination with the Rhode Island Commission For Human Rights on February 10, 2006, just days after counsel for BAI sent the first in a series of letters demanding repayment of the outstanding draw. Then, on September 1, 2006, Vasta filed the instant six-count Complaint, alleging that BAI interfered with his rights under federal and state family and medical leave laws, and terminated his employment because of his age, disability, medical leave status and/or because he blew the whistle on BAI's alleged discrimination. The undisputed facts show, however, that: (i) Vasta was not medically cleared to return at the conclusion of his statutory leave; (ii) BAI nevertheless restored him to his financial advisor position; (iii) Vasta suffered from no disability at the time of his termination; (iv) Vasta was not treated any differently due to his age; (v) Vasta complained to no one about BAI's alleged unlawful conduct; and (vi) Vasta was separated from employment for abandoning his job.

Because he cannot sustain his claims as a matter of law, this Court should grant BAI's Motion in its entirety and dismiss Plaintiff's Complaint with prejudice. Moreover, because Vasta's debt to BAI on his draw deficit it is beyond dispute, this Court should also grant Defendant summary judgment in its favor on its counterclaims against Vasta.

## II. ARGUMENT

### A. SUMMARY JUDGMENT SHOULD BE GRANTED WHERE, AS HERE, PLAINTIFF CANNOT PRESENT INDEPENDENT CREDIBLE EVIDENCE TO SUPPORT HIS CLAIMS

Summary judgment is appropriate when the pleadings, answers to interrogatories, and

depositions, together with the affidavits, if any, establish that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Hopkins v. Rhode Island, 2007 WL 1784025, *1 (D.R.I. June 21, 2007); Anabell's Ice Cream Corp. v. Town of Glocester, 925 F.Supp. 920, 923 (D.R.I. 1996) citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hope Furnace Associates, Inc. v. F.D.I.C., 71 F.3d 39, 42 (1st Cir. 1995). There is no genuine issue unless there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. Nasco, Inc. v. Public Storage, Inc., 29 F.3d 28, 32 (1st Cir. 1994). Here, as explained below, the material facts in this case are undisputed, and the record shows that Vasta cannot demonstrate all of the necessary elements for his claims to survive summary judgment. Thus, BAI is entitled to judgment as a matter of law, and the Complaint should be dismissed with prejudice in its entirety.

### B. VASTA'S CLAIMS UNDER THE STATE AND FEDERAL FAMILY AND MEDICAL LEAVE ACTS FAIL AS A MATTER OF LAW BECAUSE HE WAS INELIGIBLE FOR FMLA-PROTECTED REINSTATEMENT AND HE ULTIMATELY ABANDONED HIS POSITION

Vasta claims that BAI violated his rights under the Family Medial Leave Act ("FMLA") and the Rhode Island Parental and Family Medical Leave Act ("PFMLA")[1] in two ways. First, he maintains that BAI interfered with his FMLA rights by failing to reinstate him to the same or an equivalent position upon his return from protected leave. Second, he avers that BAI terminated his employment in retaliation for his having exercised his rights under the FMLA. Complaint ¶¶ 51-54. Vasta cannot raise a disputed issue of material fact on either of these two theories and, therefore, summary judgment is proper on his FMLA claims.

---

[1] The First Circuit has routinely construed the PFMLA in the same manner as the FMLA. Consequently, Defendant's arguments with respect to the federal FMLA apply equally to Vasta's claim under the state PFMLA. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 158 n.1 (1st Cir. 1998).

**1. BAI Did Not Interfere With Vasta's FMLA Rights Because It Granted Him More Leave Than Was Required by Law And Thereafter Restored Him To The Same Position He Held Before His Leave**

To prevail on his interference claim, Vasta must show, by a preponderance of the evidence, that: 1) he had some entitlement under the FMLA, in this case, restoration to the same or an equivalent position; and 2) that BAI interfered with his rights by failing to provide the entitlement. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 (1st Cir. 2005); Hodgens, 144 F.3d at 159; 29 U.S.C. §2614(a)(1). BAI's subjective intent is not material to this determination. Colburn, 429 F.3d at 331. Instead, the relevant inquiry on Vasta's FMLA interference claim is whether or not BAI provided him with the entitlements he was due under the FMLA. See Hodgens, 144 F.3d at 151.

**a. Vasta Was Not Entitled To Reinstatement Because He Failed To Provide The Required Fitness-For-Duty Certification At The Conclusion Of His Leave**

There is no dispute that Vasta was entitled to take 13 weeks of medical leave in order to undergo and recover from two knee replacement surgeries. Nor is there any dispute that BAI allowed Vasta to take his full leave allotment. Instead, the issue in this case is whether Vasta was eligible for a different entitlement: FMLA-protected reinstatement at the conclusion of his leave. The undisputed record evidence demonstrates that he was not.

Among other things, the FMLA entitles employees returning from qualified leave to be restored to the same position or one with equivalent benefits, pay, another terms and conditions of employment. 29 U.S.C. § 2914. This entitlement is not unconditional, however. The FMLA allows employers to require that an employee who takes leave for his own serious health condition provide a fitness-for-duty certification from his health care provider at the conclusion of the leave. 29 U.S.C. § 1614(a)(4); 29 C.F.R. § 825.310(a). Consistent with these statutory and regulatory requirements, BAI maintained a uniformly-applied policy requiring that

individuals in Vasta's position submit a fitness-for-duty certification. Defendant's Statement of Undisputed Facts ("SOF") at ¶¶ 38, 40.

BAI, through its leave administrator, MetLife, provided Vasta with explicit notice of this requirement on or about May 3, 2005, immediately after Vasta first disclosed his need for leave. SOF at ¶¶ 33-37. In addition, the Bank of America Associate Handbook contained an FMLA policy – cross-referenced in the May 3rd MetLife packet – which also stated that a fitness-for-duty certification would be required for employees returning from medical leave. SOF at ¶¶ 39-40. Then, on August 12, 2005, just two weeks before his leave entitlement expired, MetLife sent Vasta a letter outlining what he needed to do before his return-to-work date. SOF at ¶¶ 48-51. Among other things, it instructed him to contact his manager ***and*** MetLife to confirm his return to work date and cautioned that, "***failure to provide required certifications, re-certifications or notices may affect your right to return to work and your employment status with the company.***" SOF at ¶ 49. (emphasis added).

The FMLA provides for stiff consequences where employees like Vasta fail to abide by required certification obligations. Specifically, the Department of Labor's FMLA regulations state that when an employer provides the type of notice given by BAI in this case, it may delay an individual's restoration to employment until the employee submits the required fitness-for-duty certification. See 29 C.F.R. §825.310(f). The next section of the regulations takes this principle one step further, stating, "unless the employee provides either a fitness-for-duty certification or a new medical certification for a serious health condition at the time FMLA leave is concluded, the employee may be terminated." 29 C.F.R. §825.311(c); see, e.g., Burkett v. Beaulieu, Inc., 168 Fed.Appx. 895, 896 (11th Cir. 2006) (affirming summary judgment where employee failed to provide fitness-for-duty certification at the time his leave expired). In this

case, Vasta did not provide the required fitness-for-duty certification at the conclusion of his protected leave. SOF at ¶¶ 58-59. Instead, he simply called Hodges on Monday, August 29, 2005 and declared himself ready and able to return to work. SOF at ¶¶ 58, 60. He did not provide the certification when he met with Hodges and Garofano on September 8, 2005 and, until that point, he had not contacted MetLife to notify them of his return. SOF at ¶¶ 66, 68, 70. It was not until September 9, 2005, when Hodges telephoned to remind him of the requirement, that Vasta even attempted to obtain a fitness-for-duty certification from his doctor. SOF at ¶ 67. He finally submitted the mandatory certification on September 13, 2005, more than two weeks after his 13-week medical leave had expired. SOF at ¶ 70, Ex. 16. Based on these undisputed facts, any failure-to-restore claim Vasta may have had evaporated when he did not fulfill the certification requirements set forth in the Act and required by BAI policy. See Metro v. Lewis Gale Clinic, No. 7:01CV00936, 2002 WL 32833260,*2-3 (W.D. Va. Apr. 26, 2002) (granting summary judgment where plaintiff did not provide fitness-for-duty certification before her leave period expired).

**b. Vasta Was Not Entitled to Reinstatement Because He Was Unable To Return To Work At The Conclusion Of His Leave**

Vasta began his medical leave on May 27, 2005. SOF at ¶ 43. Therefore, his 12-week FMLA leave expired on August 19 and his 13-week PFMLA leave expired on August 26, 2005. When Vasta finally obtained the fitness-for-duty certification from Dr. Phillippe Cote, dated September 12, 2005, it stated that Vasta would be able to return to work on September 19, 2005 – ***three weeks after he exhausted his statutory leave entitlement***. SOF at ¶¶ 68-69, 122, Ex. 16. "Although an employee need not show up on the employer's doorstep in order to have qualified for returning from FMLA leave, the employee must be able to return to [his] prior position before [he] has a right to reinstatement." Barry v. Wing Memorial Hosp., 142 F.Supp.2d 161,

165 (D. Mass. 2001) (internal citations omitted). Because Vasta was unable to return to work until well after his FMLA leave expired, he was not entitled to reinstatement under the Act and his interference claim must fail. See id. (observing that, "courts have held that an employee has no right to reinstatement if she has not returned to work after her twelve weeks of FMLA leave have ended").

While Vasta claims that he was able to return to work without restriction at the conclusion of his leave, this unsupported opinion is at odds with his own doctor's unambiguous determination. SOF at ¶¶ 59-60, 69, 122, Ex. 16. Rather than contacting his doctor's office to seek an immediate release to return to work, however, Vasta submitted the certification to BAI on September 13, 2005. SOF at ¶ 70, Ex. 16. When Vasta contacted Hodges to notify her that he was faxing the certification, he did not alert her that it was erroneous or that he disagreed with it in any way. SOF at ¶ 71. Where Vasta had provided an adequate, albeit untimely, medical certification, BAI acted appropriately in deferring to that opinion in the absence of any reason to doubt its accuracy. In any event, BAI was well within its rights under the Act to require a fitness-for-duty certification and, once provided, to rely upon it. 29 C.F.R. § 825.310(a); see Harrell v. U.S. Postal Serv., 415 F.3d 700, 713 (7th Cir. 2005) (modified on other grounds, 445 F.3d 913) (observing with respect to return-to-work certifications that, "the provisions of the FMLA simply require an employer to rely on the evaluation of the employee's own health care provider").

Vasta does not dispute that he failed to return to work at the conclusion of his statutory medical leave. Instead, he avers that BAI "took repeated actions to delay and obstruct [his] return to work." Complaint at ¶¶ 19-25. This assertion is belied by the factual record. First, BAI policy required that employees in Vasta's position must provide return-to-work

certifications. SOF at ¶¶ 37, 38, 40. MetLife notified Vasta of this requirement before he began his leave and his obligations were spelled out in Bank of America's FMLA policy, to which he had online access prior to his leave. SOF at ¶¶ 35, 37, 40-41. In addition, correspondence from MetLife to Vasta during his leave reminded him of his obligations and the consequences should he fail to meet them. SOF at ¶¶ 49-51. Despite this parade of notices and reminders, Vasta failed to obtain the certification prior to the expiration of his leave.

Second, when Vasta finally did submit his fitness-for-duty certification, it revealed that Vasta's doctor wanted him to remain out of work for yet another week. SOF at ¶ 69. At no point did Vasta dispute this determination and did not submit a second certification to supersede it. SOF at ¶ 71. Instead, he simply continued his leave. Therefore, even assuming that Hodges and Garofano improperly forced him to meet with Garofano on September 6, later postponing the meeting until September 8, 2005, he suffered no prejudice, since he was not medically cleared to work until September 19, 2005. See Ragsdale v. Wolverine World Wide, Inc., 122 S.Ct. 1155, 1161 (2002) (holding "[Section] 2617 provides no relief unless the employee has been prejudiced by the violation...").

At bottom, Vasta did not return at the conclusion of his leave because he failed to follow BAI's uniform policies and because he simply was not medically cleared to do so. Because he took more leave than he was allowed under the law, Vasta cannot demonstrate any statutory entitlement denied by BAI and summary judgment is warranted on his FMLA interference claim. See Colburn, 429 F.3d at 331; see also Ragsdale, 122 S.Ct. at 1163 (striking regulation on grounds it impermissibly compelled employers to grant more than twelve weeks of leave).

**c. Notwithstanding His Failure To Return To Work At The Conclusion Of His Leave, BAI Reinstated Vasta To The Same Position He Held Prior To His Medical Leave**

On September 19, 2005, Vasta returned to the position of Financial Advisor, the same

position he held when his leave began. SOF at ¶¶ 72-73, 75. His compensation was still commission-based and governed by the BAI 2005 Financial Advisor Compensation Program. SOF at ¶ 74. Because it was the same position, it encompassed the same duties and responsibilities and required the same skill and professional licensure as it did prior to Vasta's leave. SOF at ¶ 75. Upon his return, he was given back the same account list he had prior to his leave. SOF at ¶ 79. While he was assigned to a new office, it was geographically proximate to his former location and, in fact, was closer to his home. SOF at ¶¶ 78, 84.

Notwithstanding the weight of the evidence that BAI restored him to the same position, Vasta raises three alleged differences that he claims show that the positions were neither the same nor equivalent.[2] Vasta's first claim – that he was denied a sales assistant upon his return – is specious, since he freely admits that he did not have access to a sales assistant prior to his leave. SOF at ¶ 89. His second claim – that BAI assigned him to a desk in an undesirable location – fares no better. Vasta was given a desk in BAI's Providence market office just like all similarly-situated financial advisors. SOF at ¶ 85. As at least one court in this Circuit has noted, "I cannot believe that Congress, in enacting the FMLA, intended to make a federal case out of office space." Hillstrom, 265 F.Supp. 2d at 127.

Vasta's final claim – that BAI impermissibly took away "his" former branches and assigned him to the Providence office – also fails to prove an interference claim. When Quick & Reilly hired Vasta, he was given a book of business and assigned to two branches, Bald Hill Road in Warwick and Post Road in North Kingstown. SOF at ¶¶ 4-5. At that time, a substantial portion of a financial consultant's business came from in-branch referrals. SOF at ¶ 6.

---

[2] While the FMLA does not define "equivalent" for reinstatement purposes, the implementing regulations define an equivalent position as, "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a); See Hillstrom v. Best Western TLC Hotel, 265 F. Supp. 2d 117, 127 (D. Mass. 2003).

Following the Fleet/Bank of America merger, however, the branch personnel were no longer given incentives to refer business to brokers like Vasta. SOF at ¶¶ 24-27, 29. Under the BAI model, the emphasis on branch referrals was replaced with a system in which brokers collaborated and garnered referrals from other professionals within Bank of America, not simply from the retail banking centers. SOF at ¶ 28. Thus, by the time Vasta took his medical leave, the benefits of working in a branch had greatly diminished.

While this change occurred before Vasta went on leave, several other changes occurred while he was away. For instance, BAI transferred Garofano to Providence and assigned him to run the market. SOF at ¶ 54. As a legacy BAI manager, Garofano ran the market differently from his legacy Fleet predecessors. SOF at ¶¶ 24-25, 55-57. Moreover, in or around June 2005, BAI completed the conversion of the old Quick & Reilly systems to the new BAI platform. SOF at ¶ 23. These changes occurred institutionally, and would have taken place regardless of whether Vasta took FMLA leave. For his part, Vasta acknowledges that the changes between Quick & Reilly and BAI were substantial. SOF at ¶¶ 24-25. Therefore, Vasta cannot now claim that he is immune from the effects of these changes simply because he may have possessed a right to reinstatement under the FMLA. <u>See</u> <u>Dressler v. Cmty. Serv. Commc'ns, Inc.</u>, 115 Fed. Appx. 452, 453 (1st Cir. 2004) (affirming summary judgment and observing, "if a change in position would have occurred regardless of whether the employee took leave, the FMLA does not protect him against such change").

In light of the changed circumstances, Garofano's decision to have Vasta report to the Providence office does not demonstrate that Vasta's restored position was not an equivalent one. Garofano, applying his own management approach, weighed the diminished importance of branch referrals, the fact that Vasta was not 100% up to speed on the new BAI systems and his

awareness of Vasta's very poor production even before the changes, and decided that Vasta would be better served reporting to the Providence office. SOF at ¶¶ 81-82. Thus, instead of allowing Vasta to languish as the lone financial advisor in a remote banking center, Garofano surrounded Vasta with peers who could – and in fact did – assist him with the new BAI approach to financial consulting. When looking at the totality of the circumstances, this difference in location is not a change in Vasta's position sufficient to constitute interference with his FMLA right to reinstatement. See Smith v. East Baton Rouge Parish Sch. Bd., 453 F.3d 650, 652 (5th Cir. 2006) (affirming summary judgment for employer despite changes to employee's job during leave due to reorganization such that it no longer required travel).

**2. Vasta Cannot Show That BAI Retaliated Against Him For Taking Medical Leave Because He Was Separated For Abandoning His Position And Can Present No Evidence of Pretext Or Discriminatory Animus**

To survive summary judgment on his FMLA retaliation claim, Vasta must first establish a prima facie case of retaliation.[3] If he is successful at this stage, the burden of production shifts to BAI to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action – in this case, Vasta's separation from employment. Once BAI makes this showing, any presumption of discrimination drops from the case and Vasta retains the ultimate burden of demonstrating that BAI's stated reason for his separation was, in fact, "a pretext for retaliating against him for having taken protected FMLA leave." See Colburn, 429 F3d at 336 (quoting Hodgens, 144 F.3d at 160-61). Here, Vasta cannot carry his prima facia burden or demonstrate that BAI's legitimate, nondiscriminatory reason for his separation – that he abandoned his position – was a pretext for FMLA retaliation.

[3] Since Vasta can present no direct evidence of retaliation, the McDonnell Douglas Corp. v. Green, 411 US 792 (1973), burden-shifting analysis will be applied to his retaliation claim. Hodgens, 144 F.3d at 160.

**a. Vasta Cannot Carry His Initial Burden At The Prima Facie Stage Because There Is No Causal Connection Between His Medical Leave And His Job Abandonment**

Vasta's FMLA retaliation claim cannot survive summary judgment unless a reasonable trier of fact could find that: (1) he engaged in a protected activity under the Act; (2) there was an adverse employment action; and (3) there was a causal connection between his protected activity and the adverse employment action. Hodgens, 144 F.3d at 161. Vasta's retaliation claim fails with respect to the third prong[4] of the prima facie case because a reasonable trier of fact could not find that a causal link existed between Vasta's medical leave and his separation from employment. Such a link requires that an adverse action be "motivated by a wrongful intent" that is patently absent from the facts of this case. See Lewis v. Gillette Co., 22 F.3d 22, 24 (1st Cir. 1994) ("there must be competent evidence … that a retaliatory motive played a part in the adverse employment actions alleged).

Here, there is no record evidence that Vasta's taking medical leave had any role in his separation. As set forth in more detail below, Vasta was separated for abandoning his job. It is undisputed that, with increasing frequency, he did not report to his Providence office during the two months following his return from medical leave. In particular, Vasta cannot dispute that neither Hodges nor Garofano saw him in the office between November 10 and 15, 2005. SOF at ¶ 108. Nor does Vasta dispute that he failed to notify BAI of his intention to work at home or that he left his BAI laptop – his only link to the BAI computer system and its essential new functionality – on his Providence desk while he was gone. SOF at ¶ 99. Finally, Vasta admits that job abandonment was the reason BAI articulated for his November 15, 2005 separation. SOF at ¶ 112. This is classic evidence of a no call/no show job abandonment and bears no causal

[4] For purposes of the instant Motion alone, Defendant assumes that Plaintiff will be able to establish sufficient facts to demonstrate the first two prongs of his prima facie case of retaliation.

relationship to Vasta's having taken medical leave. See Colburn, 429 F.3d at 335; see also Stanton v. Yancey's Food Serv. Corp., No. 04-cv-00931-LTB-MJW, 2006 WL 1684704, *4 (D. Colo. June 13, 2006) (finding no causal connection on FMLA retaliation claim where employee terminated for no call/no show violation).

**b. BAI Legitimately Separated Vasta From His Employment For Abandoning His Position**

Garofano considered the following information in determining that Vasta had abandoned his position with BAI:

- Vasta did not attend the mandatory October 18, 2005 Perspectives on Planning workshop. SOF at ¶ 94.
- When, in early November, Garofano called Vasta's BAI telephone number, he found that Vasta had not set up his voice mail system. SOF at ¶ 104.
- Vasta did not return the voice message Garofano left on Vasta's BAI telephone extension. SOF at ¶109.
- Garofano and Hodges had rarely seen Vasta in the office during the latter part of October and early November 2005. SOF at ¶ 103.
- Vasta never called BAI to inform them that he was going to be working away from the office. SOF at ¶ 96.
- Vasta had not entered any customer contacts into BAI's IRIS database. SOF at ¶ 105.
- Vasta had fewer than ten customer transactions credited to him since September 2005. SOF at ¶¶ 106-107.
- During Vasta's absences from the office, his BAI laptop was left on his desk, and without it, he could not access any of BAI's computer systems. SOF at ¶¶ 99-100,108.
- Garofano and Hodges did not observe Vasta in the Providence office at all between November 10 and November 15, 2005. SOF at ¶ 108.

Under the McDonnell Douglas framework, BAI has presented sufficient competent evidence for a rational factfinder to determine that Vasta's separation was for a legitimate and nondiscriminatory reason. See McDonnell Douglas, 411 U.S. at 804; Hodgens, 144 F.3d at 166.

**c. Vasta Can Present No Evidence That BAI's Legitimate Reason For His Separation Was a Pretext For Retaliation on the Basis of His Taking Medical Leave**

Because Vasta can present nothing more than conclusory allegations, improbable

inferences and unsupported speculation that he was terminated for taking medical leave, summary judgment on his FMLA retaliation claim is proper. See Hodgens, 144, F.3d at 167; Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994). At the outset, Vasta has no direct evidence that BAI terminated him for taking medical leave. To the contrary, he admits that Garofano never mentioned his medical leave when notifying him of his separation. In fact, Vasta did not even know if Garofano was aware of the reason he took medical leave. SOF at ¶ 63. Therefore, Vasta can attribute no statements to Garofano that evidence a retaliatory motive. See Colburn, 429 F.3d at 338.

Moreover, Vasta admits that the facts underlying BAI's determination of job abandonment are true. Among other things, Vasta concedes that: (i) he regularly worked from home without permission and without notifying BAI of his whereabouts; (ii) he left his laptop at the office while he was working from home; (iii) he did not access BAI's computer systems; (iv) he did not attend the Perspectives on Planning workshop or perform a Perspectives on Planning analysis for any of his customers; (v) he only recorded 8-10 sales transactions in the two months following his leave and all the transactions were for customers he had before joining BAI; and (vi) he never set up his work voicemail. SOF at ¶¶ 94-96, 99-100, 104, 106. In light of these admissions, Vasta cannot demonstrate pretext by showing sufficient "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in BAI's articulated rationale. See Hodgens, 144 F.3d at 168.

Instead, by all appearances, Vasta had stopped working. Even if he had been working the entire time, however, Vasta would still not be able to present a fact issue for the jury. See id. In Brunelle v. Cytec Plastics, Inc., 225 F.Supp.2d 67 (D. Me. 2002), the employer terminated an employee for violating its no-call/no-show policy after the employee was found drinking at a bar

on a night the employer thought he was taking FMLA approved leave. Id. at 79. For purposes of summary judgment, the court credited the employee's evidence that he had previously obtained permission to miss work on that evening for non-FMLA purposes. Nevertheless, the court granted summary judgment to the employer, holding that the facts "demonstrate (at best for [the employee]) a discharge unfairly based on misunderstanding and misperception, not retaliatory termination predicated on past usage of FMLA." Id. Similarly here, even if Vasta had been working from home throughout November without BAI's knowledge, that fact would not suffice to link his termination to his prior medical leave. See id.

Finally, Vasta can present no evidence that he was treated any differently than other similarly situated individuals. In fact, the record is devoid of any evidence demonstrating how BAI treated other financial advisors who took medical leave or who decided to work from home. Vasta has only identified two other financial advisors whom he claims BAI treated unfairly: Chuck Martin and Jason Longtin. With respect to these advisors, Vasta claims – based exclusively on inadmissible hearsay – that Garofano wanted to "get rid" of Martin and Longtin as well as himself. SOF at ¶ 129. Even if this were the case, it cannot constitute evidence of retaliatory animus because Vasta can present no evidence of whether Martin or Longtin ever took FMLA leave. SOF at ¶ 131. Similarly, Vasta admits that he knows of no other financial advisor who worked from home. SOF at ¶ 98. Absent comparator evidence or any other credible proof of pretext, summary judgment is proper on Vasta's FMLA retaliation claim. See Colburn, 429 F.3d at 338 (affirming summary judgment on FMLA retaliation claim where plaintiff presented no evidence that similarly situated employees were not terminated).

### C. VASTA CANNOT ESTABLISH THE NECESSARY ELEMENTS FOR HIS DISABILITY DISCRIMINATION CLAIM AND, THEREFORE, SUMMARY JUDGMENT IS APPROPRIATE

Vasta alleges that BAI discriminated against him on the basis of an alleged disability in

violation of the Americans with Disabilities Act, 42 U.S.C. § 12102 (the "ADA"), the Rhode Island Civil Rights Act, R.I.G.L. §42-112-1 ("RICRA"), and the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1 ("FEPA").[5] BAI is entitled to summary judgment on Vasta's disability claims because he cannot satisfy his initial burden of establishing a *prima facie* case of disability; namely that at the time of his termination, he was disabled or that he was terminated because of a disability.[6]

To establish a *prima facie* case of disability discrimination under the ADA, Vasta must establish that: (1) at the time of his termination from employment, he was disabled within the meaning of the Act; (2) he was able to perform the essential functions of the job with or without reasonable accommodations; and (3) he was discharged because of his disability. See Kvorjak v. Maine, 259 F.3d 48, 54 (1st Cir. 2001); Phelps v. Optima Health, Inc., 251 F.3d 21, 24 (1st Cir. 2001). Vasta cannot meet his burden with respect to the first and third required criteria to establish a *prima facie* case of disability discrimination and, accordingly, BAI is entitled to summary judgment.

**1. Vasta Cannot Show He Is Disabled Under The ADA**

In order to establish that he was disabled as defined by the ADA, Vasta must demonstrate, through specific facts within the summary judgment record, that his physical or mental impairment substantially limited one or more of his major life activities at the time of his

[5] The relevant definitions (such as "disability," "qualified individual," "record of," and "regarded as," are the same under all three statutes. For consistency and convenience, BAI will refer to these anti-discrimination statutes collectively as the "ADA" with the understanding that the applicable legal standards apply to all three statutes. See generally, DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 25 (R.I. 2005) (citing federal law pursuant to the ADA in its analysis of whether the plaintiff was disabled under FEPA and RICRA); see also Kriegel v. State of Rhode Island, 266 F.Supp.2d 288, 296 (D. R.I. 2003).
[6] Because Vasta has no direct evidence of disability discrimination, the McDonnell Douglas burden-shifting analysis applies. McDonnell Douglas, 411 U.S. at 802-05; Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006).

termination. See 42 U.S.C. § 12102(2)(A)-(C).[7] Here, Vasta alleges that his physical impairment – chronic knee condition – substantially limited him in the major life activities of walking, running, exercising and working. Hatin v. Merrimac Spool & Reel, 2003 WL 21956441, *1 (D.Mass Aug. 15, 2003) (emphasis added) citing Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002).

**a. A Chronic Knee Condition Successfully Treated By Surgery Is Not A Disability**

BAI does not dispute that Vasta had total knee replacement surgery to address an impairment to his knees. However, not all physical impairments rise to the level of a disability under the ADA. "Temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are not disabilities. Such impairments may include, but are not limited to broken limbs, sprained joints, concussions, appendicitis and influenza." 29 C.F.R. § 1630.2(j); See also Cormier v. Littlefield, 112 F.Supp.2d 196 (D.Mass. 2000). Specifically, the First Circuit has held that a knee injury that can be repaired by surgery, does not constitute a "disability" under the ADA. See Cormier, 112 F.Supp. 2d 196; see also Evans v. City of Dallas, 861 F.2d 846, 852-53 (5th Cir. 1988) (holding that plaintiff who required knee surgery was not a qualified individual with a handicap within the meaning of the Rehabilitation Act, given the transitory nature of the impairment); Kramer v. K & S Associates, 942 F.Supp. 444, 446

[7] In the alternative, a plaintiff can establish that he is disabled within the meaning of the ADA by proving that he has a "record of" an impairment that substantially limits one or more life activities or that he is "regarded as" having such an impairment. 42 U.S.C. § 12102(2)(B) and (C). Vasta has not shown "A record or history of an impairment [that] substantially limited a major life activity." Bailey, 306 F.3d at 1166. In fact, Vasta testified in his deposition that his knee impairment never interfered with his ability to work either before or after the corrective surgeries. SOF at ¶ 115. Vasta has also failed to set forth facts supporting his allegation that BAI regarded him as being disabled by failing to show that BAI either mistakenly believed he had a qualifying disability, or that BAI mistakenly believed that an actual, nonlimiting impairment substantially limited one or more major life activities. Bailey, 306 F.3d at 1169 (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)). It is not enough to show that BAI believed Vasta was somehow disabled; rather, Vasta must demonstrate that BAI believed that he was disabled within the meaning of the ADA. Bailey, 306 F.3d at 1169. Vasta's physician informed BAI that Vasta would be able to return to work on September 19, 2005 with no restrictions, and there is no indication in the record that BAI believed otherwise.

(E.D.Mo. 1996) (broken leg that healed completely in approximately six months with little or no long-term effects did not constitute a disability within the meaning of the ADA); Dodgens v. Kent Mfg. Co., 955 F.Supp. 560, 564 (D.S.C. 1997) (torn knee ligament did not substantially limit plaintiff's major life activities and was not a disability).

Vasta's medical leave of absence, following the total knee replacement surgery, lasted for approximately four months. SOF at ¶¶ 43, 72. While any deterioration of the knee may have limited Vasta's life activities before his surgery and/or during his recuperation, there is no evidence it continued to do so. By September 19, 2005, Vasta was able to return to work without restrictions. SOF at ¶¶ 69, 122, Ex. 16. Vasta's lingering knee impairment, if any, does not bring him within the scope of the Act.

**b. Vasta Was Not Substantially Limited In Any Major Life Activity At The Time Of His Termination**

Vasta's alleged impairment did not substantially limit him in any major life activity. To establish that he is "substantially limited" in an activity, Vasta "must show that his impairment 'prevents or severely restricts' his ability to perform that activity as compared with how unimpaired individuals normally perform that activity." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 196 (2002). To be a major life activity, a task must be "of central importance to daily life." See, e.g., Bailey, 106 F.3d at 1169. In evaluating the limitations imposed by a physical impairment, courts are to consider "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. §1630.2(j). Since disability is assessed as of the time of the alleged adverse employment action, Vasta must show that he was substantially limited in one or more major life activities on November 15, 2005, the date of his termination. Hatin, 2003 WL 21956441 at *1. As set forth

below, since Vasta cannot establish that he is substantially limited in his abilities to perform any major life activity, he does not have a disability as defined under the ADA.

i. Running And Exercising Are Not Major Life Activities

Vasta avers that his knee impairment impacted the major life activities of exercising and running. At his deposition he further claimed that he was unable to play tennis or perform "squats" with weights on his shoulders. SOF at ¶ 119. Even if this were true, this Court has held that "physical activity" such as this, is not a major life activity. Barber v. Verizon New England Inc., 2006 WL 3524465 (D.R.I. 2006); see also Fornes v. Osceola County Sheriff's Office, 2005 WL 2012285 (M.D.Fla. Aug.17, 2005) (inability to run and do other strenuous physical activities does not qualify as substantial limits on major life activities); Baerga v. Hospital for Special Surgery, 2003 WL 22251294 at *4 (S.D.N.Y. Sept. 30, 2003) (" 'strenuous physical activity' is not a 'major' life activity"); Gaddy v. Four B Corp., 953 F.Supp. 331, 337 n.11 (D. Kan. 1997) (physical activity not a major life activity); Scharff v. Frank, 791 F.Supp. 182, 184-185 (S.D. Ohio 1991) ("plaintiff's inability to engage in competitive sporting events and other unusually demanding physical activities did not constitute a substantial impairment of ... major life activities"). Vasta's diminished ability to engage in physical activity, such as running, exercising, or lifting weights is not a substantial limitation on a major life activity, and therefore, Vasta has failed to show that he is disabled.

ii. Vasta Was Not Substantially Limited In The Major Life Activity Of Walking

BAI does not dispute that walking is a major life activity under the ADA. See Toyota Motor Mfg., 534 U.S. at 196-97. At the time of his termination, however, Vasta was not substantially limited in this activity. In fact, he admitted in his deposition that he had no problem walking after his surgery. SOF at ¶ 120. Vasta never required a cane or a walking device, and

was able to climb stairs without difficulty. SOF at ¶¶ 120-121. Where impairments limit walking to short distances, they do not qualify as substantial limitation under the ADA. See, e.g., Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1025 (5th Cir. 1999); Kelly v. Drexel University, 94 F.3d 102, 106-108 (3d Cir. 1996). This kind of mobility betrays a claim of a substantial limitation in walking and is not consistent with those of a person substantially limited in his major life activities.

iii. Vasta Was Not Substantially Limited In The Major Life Activity Of Working

In order to be substantially limited in the major life activity of working,[8] Vasta must show that he is "significantly restricted in or precluded from performing either a 'class of jobs –a set of jobs utilizing similar skills, knowledge, and training to [his] prior job – or a 'broad range' of jobs in various classes – a large set of jobs that vary in what skill are required." Sullivan, 358 F.3d at 116. "This demonstration generally requires the introduction of evidence on the accessible geographic area, the numbers and types of jobs in the area foreclosed due to the impairment, and the types of training, skills, and abilities required by the jobs." Id. (internal quotation omitted).

Vasta claims to be substantially limited in the major life activity of working but, at the same time, nothing in the record indicates that Vasta had any difficulty at all performing the largely sedentary duties of financial advisor. In fact, in October 2005 he applied for a position with another financial institution, further illustrating that his knee impairment did not limit his ability to perform this class of jobs. SOF at ¶ 102. Vasta cannot show that he was precluded or restricted from performing his own job, let alone a class or broad range of jobs.

[8] Although the EEOC regulations include working on the list of major life activities, the United States Supreme Court has expressed some doubt. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999). The First Circuit has thus far assumed, without deciding, that working *may* be a major life activity. See Sullivan v. NeimanMarchus Group, Inc., 358 F.3d 110, 116 (1st Cir. 2004).

Furthermore, Vasta admitted that his knees did not impede him from fulfilling the requirements of a "desk job." SOF at ¶ 116. Thus, by his own admission, Vasta's knees would not limit his ability to perform a broad range of jobs. Accordingly, Vasta has not demonstrated that his knee condition substantially limited his ability to work, or any other major life activity. Other than conclusory assertions that his "chronic" problems with his knees affected his major life activities, Vasta cannot provide evidence, direct or otherwise, to support his claims. Therefore, summary judgment is warranted.

**c. Vasta Cannot Establish That He Was Terminated Because of a Disability**

Even if Vasta could establish that he was disabled under the ADA, his claims would still fail because he cannot establish, by a preponderance of the evidence, that he was terminated because of a qualifying disability. Zades v. Lowe's Home Centers, Inc., 446 F.Supp.2d 29 (D. Mass. 2006). To meet this burden, Vasta must provide sufficient evidence in the record to show that a qualifying disability was involved in the decision to terminate him. Id. at 43 (granting summary judgment for the employer where the plaintiff failed to show that disability was a factor in the decision to terminate her). To the contrary, as set forth above, BAI had a legitimate, nondiscriminatory reason to discharge Vasta independent of any physical impairment. Therefore, the only way to recover on his ADA claim would be to show that BAI's determination that he abandoned his position was merely a pretext for disability discrimination. Bishop v. Bell Atlantic Corp., 1299 F.3d 53, 58 (1st Cir. 2002). Vasta, however, has to clear two significant hurdles before he is able to show pretext.

First, Vasta must refute the clear evidence put forward by BAI showing that it was poor performance leading to job abandonment, and not disability, that constituted the real reason for his termination. Second, he must advance evidence of his own showing that BAI's asserted

reason was a pretext hiding discrimination. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir.1991) (stating that "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive") (internal quotations omitted). "Unlike the prima facie case, [Plaintiff's] general averments that he performed adequately are insufficient to create a genuine issue of fact. It is well established that at this stage, Plaintiff must produce some independent evidence showing that the company's motives are not believable." Hoffman v. Applicators Sales & Serv. Inc., 493 F.3d 9, 17 (1st Cir. 2006). The summary judgment record is wholly devoid of any evidence that either discredits BAI's proffered reason for Vasta's termination or would allow a trier of fact to reasonably infer his termination was motivated by discriminatory animus.

i. Vasta Cannot Demonstrate That Similarly Situated Employees Received More Favorable Treatment

Vasta has not produced any evidence to establish that BAI treated other similarly situated individuals outside of his protected class more favorably. Indeed, Vasta fails to provide specific evidence showing that any other employees were similarly situated to him. See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir.1996) (stating that a "claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects"). Rather than identifying any apt comparators, Vasta testified in his deposition that he is only interested in how he is treated, not others at BAI. SOF at ¶ 132. Even if he were so inclined, Vasta could not proffer such proof because it is undisputed that no such evidence of disparate treatment exists in the case at bar. Consequently, Vasta demonstrate pretext because he will be unable to provide any evidence that he was treated more harshly than other similarly situated coworkers without a disability.

ii. Vasta Did Not Request Any Accommodations

Although it is unclear from the Complaint if Vasta alleges pretext based on BAI's refusal to provide a reasonable accommodation for his alleged knee impairment, he has nonetheless failed to meet his burden. The ADA's regulations provide that employers have a duty to engage an informal, interactive process with a disabled employee to identify reasonable accommodations. 29 C.F.R. § 1630.2( o)(3) (2005); See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100 (1st Cir. 2005.) However, it is the employee's initial request for a reasonable accommodation that triggers the employer's obligation to participate in the interactive process of determining such an accommodation. Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001). Thus, employee has the burden of showing that he "sufficiently requested the accommodation in question." Id. at 260; see also Estades-Negroni, 377 F.3d at 64 (requiring request to be "express" and "linked to a disability"). Because Vasta admitted repeatedly in his deposition that he never required or requested an accommodation from BAI, he has failed to discredit BAI's articulated reason for his termination.[9] Consequently, BAI is entitled to summary judgment on Vasta's disability discrimination claims.

2. Vasta Cannot Proffer Any Evidence to Support Retaliation

Vasta alleges that BAI retaliated against him in violation of the ADA. To establish a *prima facie* claim for retaliation, Vasta must show that: (1) he engaged in protected conduct; (2) he suffered an adverse employment action; and (3) there was a causal connection between his conduct and the adverse employment action. Wright v. CompUSA, Inc., 352 F.3d 472, 477 (1st Cir. 2003). Vasta is unable to establish a *prima facie* case as the record is devoid of any alleged protected activity that Vasta participated in that resulted in his termination.

[9] To the extent Vasta's Complaint can be contorted to allege a "failure to accommodate" claim, such a claim would fail for the same simple fact that Vasta admits that he never requested an accommodation of any kind.

The ADA's prohibition against retaliation and coercion states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). While requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision, Vasta admitted that he never required or sought one from BAI. SOF at ¶ 114-116. Freadman v. Metropolitan Property and Cas. Ins. Co., 484 F.3d 91 (1st Cir. 2007). At the time of his termination, Vasta had not complained to anyone about any alleged disability discrimination or threatened to file a lawsuit or administrative charge of discrimination. SOF at ¶¶ 132-133. As such, Vasta's retaliation claim likewise fails.

### D. VASTA CANNOT ESTABLISH THE NECESSARY ELEMENTS FOR HIS AGE DISCRIMINATION CLAIM AND, THEREFORE, SUMMARY JUDGMENT IS APPROPRIATE

#### 1. Vasta Is Unable To Prove A Prima Facie Case Of Age Discrimination

Vasta alleges that he was terminated due to unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). To establish a *prima facie* case of age discrimination under the ADEA, Vasta must establish that: (1) [he] was at least forty years of age; (2) [his] job performance met the employer's legitimate expectations; (3) the employer subjected [him] to an adverse employment action; and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Mesnick, 950 F.2d at 823. Furthermore, to demonstrate an ADEA claim, the "plaintiff's age must actually have played a role in the employer's decision-making process and have had a determinative or motivating influence on the outcome." Hoffman, 439 F.3d at 17 (citing Reeves v. Sanderson Plumbing Prods., Inc., 120 S.Ct. 2097 (2000)). Vasta's age discrimination claim fails because he will be unable to satisfy

the second and fourth elements of the *prima facie* case – that he met the employer's legitimate expectations and was replaced by a younger candidate.

In order to satisfy the second prong, Vasta must establish that he was performing his job "at a level which met [his] employer's legitimate expectations." Connell v. Bank of Boston, 924 F.2d 1169 (1st Cir. 1991). By his own admission, Vasta cannot demonstrate that his performance was satisfactory. Even prior to his leave of absence, Vasta's production was dismal. In the two months following his return from leave, Vasta recorded fewer than ten customer transactions. SOF at ¶ 106. While he had access to several on-line, self-directed training modules to assist him with the new BAI model, Vasta failed to avail himself of any such training. SOF at ¶¶ 88, 92-94. Instead, Vasta claims he began to work at home; yet he never sought permission or thought to advise Garofano of his modified his work arrangement. SOF at ¶¶ 95-97. Further, BAI had significant reason to doubt that Vasta was actually working, since he left his BAI laptop at the office and never changed his voice mail message to alert clients or colleagues as to his whereabouts. SOF at ¶¶ 99, 104. Clearly, Vasta had no desire to work at BAI and this became apparent when Vasta admitted that he was looking for other employment as early as October 2005. SOF at ¶ 102. Finally, Vasta has also failed to produce any evidence that he was replaced by a younger individual following his termination. Therefore, it is undisputed that Vasta cannot meet the required criterion necessary to establish a *prima facie* case.

**2. Vasta Is Unable To Prove Pretext**

Even if Vasta could establish a *prima facie* case of age discrimination, BAI is entitled to summary judgment unless Vasta is able to provide credible, admissible evidence sufficient to raise an issue of material facts as to whether BAI stated reason for discharging him – job abandonment – was a pretext aimed at covering-up intentional age discrimination. See McDonnell Douglas, 411 U.S. at 792; Mesnick, 950 F.2d at 825.

Similar to Vasta's claims of disability discrimination, there is no evidence in the record that indicates that BAI's legitimate reason for discharging Vasta, i.e., job abandonment, was in any way a pretext for age discrimination. In the absence of evidence of pretext, Vasta relies solely on his subjective belief that he was discriminated because of his age, and not on any facts in the summary judgment record. While Vasta testified in his deposition that he "absolutely" felt discriminated against because of his age, he has failed to produce any credible evidence. SOF at ¶ 126. Vasta admits that Garofano never made any comments concerning Vasta's age, including during the telephone call in which he notified Vasta that he was being separated from employment for job abandonment.[10] SOF at ¶ 126. Nevertheless, Vasta felt as if Garofano thought of him as a dinosaur and terminated him as a result. Vasta cannot survive a motion for summary judgment based on his unsubstantiated opinion alone. "In opposing summary judgment, conclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact." Bartlett v. American Power Conversion Corp., No. CA 05-084 ML, 2006 WL 2709404, *2 (D.R.I. Sept. 20, 2006).

Vasta has also failed to prove pretext by showing that similarly situated employees who were not in his protected class were treated differently under substantially similar circumstances. First, Vasta can identify no other employees to whom he is similarly situated who were treated more favorably than he. In fact, Vasta admitted that he did not know of anyone who was treated more favorably because of their age. SOF at ¶ 132. Second, when asked at his deposition if Garofano discriminated against anyone else on the basis of their age, Vasta simply responded

[10] The only comment Vasta can recall that is even remotely age-related was made by Hodges, who on occasion, referred to Vasta as "Uncle Joe." SOF at ¶ 127. As an initial matter, Vasta admits that he did not find this conduct discriminatory in any way. SOF at ¶ 127. In any event, this single comment, made by someone who is not a decision maker, does not in any way relate to BAI's employment decision to terminate Vasta's employment. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir.2001). This stray remark "would not be significantly probative of pretext absent some discernible indication that its communicative content, if any, materially erodes the stated rationale for the challenged employment action." Id.

"No." SOF at ¶ 134. In sum, Vasta has not put forth sufficient evidence from which a trier of fact could conclude that BAI's termination of his employment for job abandonment was actually a pretext for age discrimination.[11]

### E. VASTA'S WHISTLEBLOWER CLAIM MUST FAIL BECAUSE HE NEITHER REPORTED BAI'S CONDUCT TO A PUBLIC BODY NOR THREATENED TO DO SO

Vasta claims that BAI discriminated and retaliated against him in violation of the Rhode Island Whistleblower's Protection Act, R.I.G.L. § 28-50-1. Complaint ¶ 66-69. In order to prevail on his claim, Vasta must show that he was discriminated against because he reported or was about to report to a public body that BAI was engaging (or was about to engage) in unlawful conduct. R.I.G.L. § 28-50-3. Here, Vasta did not bring his EEOC charge until February 2006 – 3 months after his termination, and nearly 5 months after he returned from leave.[12] As the Court observed in Rossi v. Amica Mut. Ins. Co., 446 F.Supp.2d 62, 70 (D. R.I. 2005), "[w]ithout the assistance of a crystal ball or a time machine, it is a legal impossibility for Amica to have terminated Rossi in March 2001, because of her filing a report of discrimination ten months later in December 2001." See id. But for the names of the parties and the corresponding dates, these facts are identical to the case at bar. Therefore summary judgment is appropriate. See Id.; Maturi v. McLaughlin Research Corp., 413 F.3d 166, 174 (1st Cir. 2005).

### F. BAI IS ENTITLED TO SUMMARY JUDGMENT ON ITS THEORY OF QUANTUM MERUIT FOR THE COMMISSION DEFICIT INCURRED BY VASTA PRIOR TO HIS TERMINATION

BAI is entitled to summary judgment on the theory of quantum meruit on the grounds that, upon termination, Vasta failed to repay a commission deficit he had incurred for the period

---

[11] In Count II of his Complaint alleging violations of the ADEA, Vasta avers that BAI retaliated against him for "asserting his rights to be free from workplace discrimination based on age." Compl. ¶ 44. In his deposition, however, Vasta admitted that he never complained to anyone regarding age discrimination. Therefore, he did not engage in any protected conduct, and he cannot prove a claim of ADEA retaliation. Ramírez-Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 84 (1st Cir. 2005).

[12] At his deposition, Vasta testified: "I was terminated in November, and I didn't make the decision to even inquire about a lawsuit until sometime in late February, so it was not on the top of my mind." SOF at ¶ 137.

December 2004 through November 2005. To recover under a claim of unjust enrichment, a plaintiff is required to prove three elements: (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation by the defendant of such benefit, and (3) an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof. Narragansett Electric Company v. Carbone, 898 A.2d 87, 99 (R.I. 2006). The essence of this tort is "the equitable principle that one shall not be permitted to enrich himself at the expense of another by receiving property or benefits without making compensation for them." Id.

BAI has produced sufficient credible evidence to satisfy its burden on each of these elements. First, Vasta was conferred a benefit each pay period by his acceptance of a monthly draw. Vasta recognized that a draw would constitute an advance against the anticipated commissions he would earn by producing revenue. SOF at ¶ 10. This concept was certainly nothing new to Vasta, who admitted that the terms were the same for every draw that he had encountered since 1968. SOF at ¶¶ 15-16. However, Vasta failed to generate the required commissions to cover the draw and thus incurred a deficit. SOF at ¶ 22.

Second, there is no doubt that Vasta appreciated the benefit of the monthly draw. Since Vasta's monthly commissions were non-existent, without the draw, he would be generating very little or any compensation. Vasta admitted that he was compensated on a commission basis and that a deficit would accrue if his monthly commissions, based on production, did not meet this draw amount. SOF at ¶¶ 9-11. At the time of his separation from employment with BAI on November 15, 2005, Vasta had accumulated a deficit of $11,363.88. SOF at ¶ 138.

Finally, Vasta enriched himself at the expense of BAI. The parties did not intend for the draw to represent wages to Vasta. In fact, the Banc of America Investment Services, Inc. 2005

Financial Advisor Compensation Program (the "2005 Plan"), which contemplated both sales commissions and a periodic draw, provided that Financial Advisors "are responsible for the repayment of any overpayments or deficits." SOF at ¶ 14, Ex. 26. Vasta acknowledged that he was bound by the terms of the 2005 Plan, and further evidenced his acceptance, by continuing his employment. SOF at ¶ 13. Therefore, it would be inequitable for Vasta to retain the benefit conferred upon him by BAI during his employment and summary judgment should be granted in favor of BAI. [13]

## III. CONCLUSION

For the reasons explained above, Banc of America Investment Services, Inc. respectfully requests an Order granting its Motion for Summary Judgment and dismissing the Complaint with prejudice in its entirety. Defendant respectfully requests that the Court grant allow for oral argument on this Motion of approximately 20 minutes for each party.

---

[13] In addition to a count for unjust enrichment, BAI is also seeking relief under the equitable doctrine of money had and received. This count is premised on similar facts raised in the quantum meruit argument above. If it is found that Vasta received money which, in equity and good conscious belongs to BAI, BAI is entitled to summary judgment on this count. With respect to the breach of contract claim also maintained in the Counterclaim, BAI alleges that it had an implied contract with Vasta based on mutual assent or a "meeting of the minds between the parties" as to the repayment of any commission deficit. J. Koury Steel Erectors, Inc. of Massachusetts v. San-Vel Concrete Corp., 387 A.2d 694, 697 (1978). Vasta cannot dispute that he accepted the terms of the 2005 Plan or that he understood the principals behind a draw. SOF at ¶ 12-15. Vasta himself testified that a "draw is a draw." SOF at ¶ 16.

Respectfully submitted,

BANC OF AMERICA INVESTMENT SERVICES, INC.
By its attorneys,

*/s/ Mark A. Pogue*

Mark A. Pogue (#3341)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200

Alice A. Kokodis (*pro hac vice*)
Brian P. Pezza (*pro hac vice*)
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 439-4444

Dated: October 5, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of October 2007, I caused a copy of the foregoing document to be delivered by U.S. mail and by operation of the Court's electronic filing system to:

Stephen T. Fanning, Esquire
The Law Offices of Stephen Thomas Fanning
350 South Main Street
Providence, RI 02903

/s/ Mark A. Pogue
Mark A. Pogue