**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

JOSEPH VASTA,

Plaintiff,

v.

BANC OF AMERICA INVESTMENT SERVICES, INC.,

Defendant.

C.A. No.: 06-396-ML-DLM

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56, defendant Banc of America Investment Services, Inc. ("BAI" or "Defendant") respectfully submits this Statement of Undisputed Facts in support of its Motion For Summary Judgment.[1]

**A. BAI's Predecessor, Quick & Reilly, Hired Vasta In February 2004**

1. BAI, a wholly-owned subsidiary of Bank of America, N.A. ("Bank of America"), serves more than 1 million clients through a network of investment representatives and financial advisors in more than 30 states, including Rhode Island. Affidavit of Caryn Hodges ("Hodges Aff.") at ¶ 2.[2]

2. In February 2004, Quick & Reilly, Inc. ("Quick & Reilly"), the brokerage arm of FleetBoston Financial Corporation ("Fleet"), hired Vasta as a financial advisor. May 7, 2007 Deposition of Joseph Vasta ("Vasta Dep. I") at 49:6-12, 59:22-60:11.[3] At the time of his hire,

[1] All facts contained in this Statement are deemed undisputed for purposes of this Motion only, and Defendant does not waive any right to dispute such facts during the remainder of this litigation.
[2] The Affidavit of Caryn Hodges is attached hereto as Exhibit A.
[3] Cited portions of the May 7, 2007 Deposition of Joseph Vasta are attached hereto as Exhibit B.

Vasta was 62 years old and had more than 30 years of experience in the financial services and brokerage business. Vasta Dep. I at 19:24-20:7, 55:9-12.

3. In or around April 2004, Bank of America merged with Fleet, and Quick & Reilly became a part of BAI. Hodges Aff. at ¶ 3. Vasta continued employment after the Bank of America merger as a financial advisor for BAI. Hodges Aff. at ¶ 4.

4. Initially, Quick & Reilly gave Vasta a book of business that had previously been serviced by a departed broker and assigned him to work out of an office at Fleet's Post Road branch in North Kingstown, Rhode Island. Vasta Dep. I at 52:1-54:15; Hodges Aff. at ¶ 5.

5. Vasta also worked a portion of the time from Fleet's Bald Hill Road branch in Warwick, Rhode Island. Vasta Dep. I at 102:16-21.

6. At the time it hired Vasta, Quick & Reilly expected him to service bank customers and generate business, largely through referrals from bank branch personnel. Vasta Dep. I at 60:5-15, 79:7-10, 84:1-5; Hodges Aff. at ¶ 6.

## B. Vasta Understood The Terms Of His At-Will Employment, Including The Fact That He Would Be Paid A Recoverable Draw If He Did Not Reach Certain Monthly Commission Levels

7. Vasta was an at-will employee. Vasta Dep. I at 56:18-57:5, Ex. 2, p.4.[4] He understood that at-will meant that he had no guarantee of employment, contractual or otherwise, for any specified period of time, and that Quick & Reilly or BAI were free to terminate him at any time, for any reason. Vasta Dep. I at 57:12-58:7, 64:11-65:17, Ex. 2, p.4.

8. Vasta acknowledged his awareness of this at-will status in writing on at least two occasions, first in his January 27, 2004 employment application, and second in his February 5, 2004 acknowledgment of Quick & Reilly's offer of employment (the "Offer Letter"). Vasta Dep. I at 57:12-58:7, Ex. 2, p. 4, 64:11-65:17, Ex. 4, pp. 2-3.

[4] Cited exhibits to Plaintiff's depositions are attached collectively as Exhibit D.

9. Vasta was compensated on a commission basis; he did not receive a salary. Vasta Dep. I at 63:2-9, 65:18-66:1.

10. Vasta would also receive a draw, which was "an advance against anticipated compensation that [he would] earn by producing revenue." Vasta Dep. I at 65:18-66:13, Ex. 4, p. 2.

11. The Offer Letter further stated that, "[i]n the event your net incentive compensation for any production month does not exceed your draw, a deficit will accrue, and you acknowledge that Quick & Reilly has the right to offset your deficit with any future Incentive Compensation payments." Vasta Dep. I at 65:18-66:13, Ex. 4, p. 2.

12. Vasta accepted the terms of his employment – including the draw – by signing the Offer Letter on February 5, 2004. Vasta Dep. I at 66:19-21, Ex. 4, p. 3.

13. In 2005, following the Bank of America merger, Vasta became subject to the BAI Financial Advisor Compensation Program. Defendant's Amended Answer and Counterclaim ("Counterclaims") (Docket No. 13) at Counterclaims ¶¶ 9-10; Plaintiff's Reply to Counterclaim (Docket No. 18) at ¶¶ 9-10.

14. The 2005 BAI Compensation plan provided that financial advisors like Vasta "are responsible for the repayment of any overpayments or deficits." Counterclaims at ¶10; Reply to Counterclaims at ¶10; July 16, 2007 Deposition of Joseph Vasta ("Vasta Dep. II") at Ex. 26.[5]

15. Further, Vasta understood the terms of the draw, which were the same as every other draw that he had encountered since 1968. Vasta Dep. I at 33:18-24, 63:10-21.

16. According to Vasta, "a draw is a draw." Vasta Dep. I at 63:12-15.

[5] Cited portions of the July 16, 2007 Deposition of Joseph Vasta are attached hereto Exhibit C.

**C. Vasta Demonstrated Poor Performance At Both Quick & Reilly And BAI**

17. At the time Vasta was applying for his position, both he and Quick & Reilly expected that he would generate at least $400,000 in gross production in the first year of his employment – based on his past performance with other brokerages. Vasta Dep. I at 62:1-63:1.

18. Vasta also provided Quick & Reilly with documentation to support his past production. Vasta Dep. I at 61:12-24, Ex. 3.

19. However, Vasta did not generate near the $400,000 that he had anticipated, but instead his total 2004 revenue failed to reach $100,000. Vasta Dep. I at 104:1-105:5, Ex. 5. Vasta admitted that his production was terrible and that it "just didn't materialize." Vasta Dep. I at 62:21-63:1, 94:2-4.

20. Vasta's production numbers were also well below those of the other employees in his region, and he "fell towards the bottom" of the production scale relative to his co-workers in 2004. Vasta Dep. I at 94:9-11.

21. Similarly, in the first half of 2005, Vasta's performance lagged behind his fellow financial consultants and he remained "near the bottom." Vasta Dep. I at 114:17-19.

22. As a result of his low level of commissions, Vasta regularly received draw payments as an advance on his earnings. Vasta Dep. II at 97:14-103:15, Ex. 22; Affidavit of Elizabeth Weiler at Exhibit E at ¶ 4.[6]

**D. BAI Implemented Numerous Changes During The Conversion From The Quick & Reilly Business Model**

23. BAI merged with Quick & Reilly in or around April of 2004, but all phases of the transition to the BAI platform were not completed until June of 2005. Hodges Aff. at ¶ 7; Affidavit of Louis Garofano ("Garofano Aff.") at ¶ 3.[7]

[6] The Affidavit of Elizabeth Weiler is attached hereto as Exhibit E.

24. The BAI system introduced an entirely different approach to investing, one that was more sophisticated than the Quick & Reilly model into which Vasta had been hired. Vasta Dep. I at 150:22-151:19.

25. According to Vasta, the BAI model implemented a "whole different structure" into the workplace. Vasta Dep. I at 150:22-151:1.

26. Before the transition, Vasta worked closely with banking center associates because he needed them to provide him with referrals for his investment services. Vasta Dep. I at 89:7-90:22.

27. Starting in the fall of 2004, however, Bank of America eliminated the program in which banking center associates were provided with incentives to make referrals to financial advisors like Vasta. Vasta Dep. I at 91:14-92:6; Garofano Aff. at ¶¶ 4-5.

28. At that time, Bank of America instituted a program in which the financial advisors would partner with "Premier Bankers" with the goal of cross-selling banking products and providing an increased level of service to Bank of America's customers. Vasta Dep. I at 94:12-95:7; Garofano Aff. at ¶ 5.

29. Following implementation of the Premier Banking Program, the emphasis on branch referrals was diminished. Vasta Dep. I at 91:19-92:1; Garofano Aff. at ¶ 6.

30. Along with the new, full-service BAI platform came new computer systems – which included, among other things, online research tools and investment recommendation guidance that was updated daily - and a new investment analysis tool called "Perspectives on Planning." Vasta Dep. I at 106:21-107:21; Garofano Aff. at ¶ 7.

---

[7] The Affidavit of Louis Garofano is attached hereto as Exhibit F.

31. In the Spring of 2005, Vasta went through numerous training courses, including two multi-day seminars and various web-based training modules, in order to learn the BAI platform. Vasta Dep. I at 105:6-106:20, 109:9-110:6, Ex. 6.

32. Vasta was current on his training requirements through the end of May 2005. Vasta Dep. I at 109:24-110:6; Vasta Dep. II at 29:1-8.

### E. <u>Vasta Requested Medical Leave In Early May 2005 And Was Fully Apprised Of His Rights Under The FMLA</u>

33. Before the final BAI conversion, in early May 2005, Vasta contacted administrative assistant Caryn Hodges ("Hodges") to inquire about the steps necessary to take a medical leave of absence to have total knee replacement surgery. Vasta Dep. I at 122:7-22.

34. Hodges gave Vasta the number of Bank of America's Human Resources department, which, in turn, referred him to Metropolitan Life Insurance Company ("MetLife"), who administered BAI's medical leave and short term disability policy. Vasta Dep. I at 122:20-123:1.

35. On May 3, 2005, MetLife mailed Vasta a packet that contained all of the materials needed for an employee to take a leave of absence, including forms for Vasta and his doctor to complete and a notice of Vasta's rights and obligations under the Family and Medical Leave Act ("FMLA"). Vasta Dep. at 122:24-123:19, Ex. 9.

36. Vasta read the MetLife materials and understood that he was completing and submitting information to request a medical leave of absence from BAI. Vasta Dep. I at 123:18-124:4, 124:11-125:23.

37. Among other things, the MetLife materials stated that Vasta would "be required to present a fitness-for-duty certificate prior to being restored to employment. If such

certification [was] not received, [his] return to work may be delayed until certification [was] provided." Vasta Dep. I at 126:20-127:6, Ex. 9, p. 2.

38. The Bank of America Associate Handbook expressly notified that a "failure to return to work after the scheduled end of leave, including FMLA leave, without notifying the company in advance is considered a voluntary resignation." Vasta Dep. I at 110:14-111:5, Ex. 7, p. 126-27.

39. The MetLife kit also instructed Vasta to refer to the Associate Handbook in order to obtain additional information on FMLA leave. Vasta Dep. I at 127:7-11, Ex. 7, p.124, Ex. 9, p.2.

40. The Associate Handbook contained an FMLA policy, which contained the fitness-for-duty certification requirement. Vasta Dep. I at 127:7-11, Ex. 7, p. 126-27.

41. Vasta was also aware that the contents of the Associate Handbook were readily available on the BAI intranet, to which he had access during the month before his leave began. Vasta Dep. I at 111:2-5.

42. Vasta asked his doctor to fill out the Health Care Provider Certification contained in the MetLife kit and submitted the completed Certification to MetLife on or about May 9, 2005. Vasta Dep. I at 123:15-124:10, Ex. 9, p. 4-6.

43. Vasta began his leave of absence on or about May 27, 2005. Complaint (Docket No. 1) at ¶ 18.

44. Vasta had knee replacement surgery on his right knee on May 30, 2005 and on his left knee six weeks later. Vasta Dep. I at 122:2-3, 134:15-20.

### F. MetLife Approved Vasta's FMLA Leave Request And Regularly Communicated With Him During His Time Away

45. On June 7, 2005, MetLife sent Vasta letters approving his requests for FMLA leave and short-term disability compensation for the time period of May 30 through July 31. Vasta Dep. I at 130:7-14, Exs. 10, 11.

46. When Vasta failed to provide updated medical information by July 31, 2005, MetLife closed his claim. Vasta Dep. I at 137:13-138:3, Ex. 12.

47. After he received notification of MetLife's closure of his claim, Vasta telephoned MetLife to inquire about how to extend his leave, since he had recently had surgery on his second knee. Vasta Dep. I at 142:2-13.

48. Vasta then instructed his doctor to fax MetLife his hospital report and, on August 12, 2005, MetLife sent Vasta letters notifying him that his FMLA leave had been approved through August 26, 2005 and that his short-term disability payments would continue through August 31, 2005. Vasta Dep. I at 129:21-130:2, 141:14-143:15, Exs. 13, 14.

49. One of MetLife's August 12 letters contained a series of bullet points under the heading, "What you need to do before your scheduled return-to-work date." The final two bullets provided:

- A few days before your scheduled return-to-work date, contact your manager and MetLife to confirm the date you will return to work.
- You must promptly report to work on your scheduled return-to-work date. Failure to do so or failure to provide required certifications, re-certifications or notices may affect your right to return to work and your employment status with the company.

Vasta Dep. I at 138:4-5, 139:13-140:9, Ex. 13.

50. The letter also instructed Vasta to refer to the Associate Handbook, which included more information about his benefits, and to contact MetLife with any questions. Vasta Dep. I at 140:5-9, Ex. 13.

51. The second and third August 12 letters stated that Vasta would exhaust his federal and state leave entitlements on August 26, reminded him to review the document previously provided titled "Your Rights under Family and Medical Leave Act of 1993," invited him to contact his manager about the status of his job and also instructed him to call MetLife with any questions. Vasta Dep. I at 129:21-130:2,141:14-143:15, Exs. 14, 15.

52. Vasta does not deny that he received the August 12, 2005 letters from MetLife. Vasta Dep. I at 129:21-130:2, 139:2-21, 143:13-15.

### G. BAI Implemented Structural Changes Affecting All Brokers In The Rhode Island Market While Vasta Was On Leave

53. In or around June 2005, BAI implemented the remaining changes required to fully convert the legacy Quick & Reilly systems to the new BAI platform. Garofano Aff. at ¶ 8; Hodges Aff. at ¶ 7.

54. In the midst of this transition, BAI assigned Lou Garofano ("Garofano"), a BAI manager from Arizona, to head the Rhode Island Market. Garofano Aff. at ¶ 2, 9.

55. Garofano's Arizona Market had been using the full-service BAI platform since its inception. Garofano Aff. at ¶ 11.

56. BAI continued to train its financial advisors on the Perspectives on Planning tool and the other new BAI systems throughout the summer. Garofano Aff. at ¶ 12; Hodges Aff. at ¶ 8.

57. The changes resulting from the conversion to BAI systems were market-wide and affected all financial advisors in the same manner. Garofano Aff. at ¶ 13.

### H. <u>Vasta Attempted To Return To Work Without Providing A Fitness-For-Duty Certification Or Following The Procedures Outlined In MetLife's Letters</u>

58. Vasta did not contact either BAI or MetLife concerning his return to work until he telephoned Hodges on August 29, 2005, the first business day after his statutory leave entitlement had expired. Vasta Dep. I at 139:22-140:4, 143:16-18, 148:12-149:7.

59. As of August 29, Vasta had no medical documentation stating that he was cleared to return to work. Vasta Dep. I at 143:16-144:6.

60. When speaking with Hodges, Vasta stated that he was ready to return to work and asked whether he would need to first meet with the new market manager, Garofano. Hodges replied that Vasta would have to meet with Garofano and scheduled a meeting for Garafono's next available appointment, which was September 6, 2005. Vasta Dep. I at 143:16-144:3, 145:7-13; Hodges Aff. at ¶ 9.

61. Hodges later rescheduled the meeting to September 8 to accommodate Garofano, who could not attend the September 6 meeting due to the death of a family friend. Vasta Dep. I at 145:7-14; Garofano Aff. at ¶ 17; Hodges Aff. at ¶ 10.

62. During the September 8 meeting, Garofano informed Vasta that he should have returned to work on September 1 and asked him whether he had yet contacted MetLife to discuss his return to work. Vasta Dep. I at 148:12-149:7; Garofano Aff. at ¶ 18.

63. Vasta, who was unaware of whether Garofano knew the reason for his leave, replied that he had not contacted MetLife. Vasta Dep. I at 149:5-7, 162:8-13.

64. Garofano then explained BAI's mission and new platform to Vasta. Vasta Dep. I at 150:9-152:5; Garofano Aff. at ¶ 19.

65. In response to Vasta's inquiry about why his customers had been reassigned, Garofano informed him that they had simply been covered by another broker in his absence. Vasta Dep. I at 155:14-17; Garofano Aff. at ¶¶ 14-15, 20.

66. Following his meeting with Garofano and Hodges, Vasta finally contacted MetLife concerning his return to work. Vasta Dep. I at 149:5-9, 163:10-18.

### I. Vasta Was Not Cleared By His Physician To Return To Work Until September 19, 2005

67. On September 9, 2005, after being reminded by Hodges, Vasta contacted his doctor, Phillipe Cote, M.D., to request a return-to-work certification. Vasta Dep. I at 163:10-164:14.

68. It was not until September 12, however, that Vasta was able to obtain the doctor's return-to-work certificate. Vasta Dep. I at 164:10-23; Vasta Dep. II at 12:22-13:24.

69. The September 12 return-to-work note stated that Vasta was medically cleared to return to work at BAI on September 19, 2005, with no restrictions. Vasta Dep. II at 14:19-21, 15:10-16:8, Ex. 16.

70. Vasta faxed the return-to-work certification to Hodges on September 13. Vasta Dep. II at 17:20-24, Ex. 16; Hodges Aff. at ¶ 11.

71. When Vasta contacted Hodges to notify her that he was faxing the certification, he did not alert her that it was incorrect or that he disagreed with it in any way. Vasta Dep. II at 17:20-18:6; Hodges Aff. at ¶ 12.

### J. BAI Reinstated Vasta To The Same Position He Had Held Prior To His FMLA Leave

#### (i) Vasta's Position Was Restored

72. Vasta returned to work on September 19, 2005. Vasta Dep. II at 18:7-10.

73. BAI reinstated Vasta to the position of financial advisor in the Rhode Island Market. Garofano Aff. at ¶ 21; Hodges Aff. at ¶ 13; Vasta Dep. II at 18:7-10, 40:9-13.

74. Vasta remained subject to the same compensation plan (the BAI 2005 Financial Advisor Compensation Program) and eligible for the same employment benefits as he had prior to his leave. Hodges Aff. at ¶ 14.

75. Because it was the same position, it encompassed the same duties and responsibilities and required the same skill and professional licensure as it did prior to Vasta's leave. Hodges Aff. at ¶ 15; Garofano Aff. at ¶ 22.

76. While Vasta's supervisor changed during his leave, the reporting structure did not – Vasta still reported to the Rhode Island Market Director. Garofano Aff. at ¶ 23; Hodges Aff. at ¶ 16.

**(ii) <u>Vasta's Customer List Was Restored</u>**

77. In early August 2005, Garofano began the process of assigning another broker, Stuart Latessa ("Latessa"), to cover Vasta's branches and customers during Vasta's leave. Garofano Aff. at ¶ 14.

78. By late August or early September, Latessa, who had been working in a different market, was transferred to the Rhode Island Market, provided with a list of Vasta's customers and was assigned to cover the North Kingstown and Bald Hill Road banking centers. Garofano Aff. at ¶ 15; Vasta Dep. I at 153:2-20, 154:5-6.

79. Notwithstanding Latessa's transfer, BAI reassigned Vasta's former client list to him upon his return. Garofano Aff. at ¶ 24; Hodges Aff. at ¶ 17.

**(iii) <u>Vasta Was Assigned To The Providence Office, Which Could Offer Him More Support Than A Small Branch Office</u>**

80. Upon his return from leave, Vasta was not completely knowledgeable on the new BAI systems. Vasta Dep. II at 38:6-8.

81. Moreover, Garofano was aware that Vasta's production prior to his medical leave was extremely low. Garofano Aff. at ¶ 25.

82. In light of Vasta's low production and need to get up to speed on the BAI systems, Garofano assigned Vasta to work out of the Rhode Island Market's main office in Providence. Vasta Dep. I at 159:18-23; Garofano Aff. at ¶ 26.

83. Not only did Garofano and Hodges work out of the Providence office, but so did all but one of the market's sales assistants, and more brokers were assigned there than any other location. Garofano Aff. at ¶ 27; Hodges Aff. at ¶ 18.

84. At the time, Vasta was living in his Barrington, Rhode Island home. Vasta Dep. I at 11:23-12:4.

85. Vasta, like other brokers in the Providence office, was assigned to a specific desk. Vasta Dep. I at 156:22-158:22; Hodges Aff. at ¶ 19.

86. While Vasta was not pleased with the location of his desk, he never complained about it and, in addition, was unaware of whether any other desks were available at the time of his return. Vasta Dep. I at 157:13-158:22.

**(iv) <u>Vasta Had Access To Individuals Who Could Answer His Questions Regarding The New BAI Systems</u>**

87. Latessa and other brokers provided answers to Vasta's questions about the BAI platform after he returned. Vasta Dep. II at 36:21-37:7.

88. Even though Hodges had assisted him in the past, and was available to help him upon his return, Vasta never asked for her help in learning or using the new BAI systems. Vasta Dep. II at 38:20-39:5; Hodges Aff. at ¶ 20.

89. While Vasta claims that he was denied access to a sales assistant following his leave, he admits that he did not have a sales assistant prior to his leave. Vasta Dep. II at 32:2-4.

90. Vasta never requested to be assigned a sales assistant and he never questioned why his name was allegedly left off of a list setting forth sales assistant assignments. Vasta Dep. II at 29:21-31:19.

91. Vasta is not aware of a single instance following his return from leave in which he needed assistance but was unable to get it. Vasta Dep. II at 37:3-7.

#### (v) Vasta Failed To Take Advantage Of The Training Opportunities BAI Had To Offer

92. BAI had dozens of on-line, self-directed training modules that were available to its brokers. Hodges Aff. at ¶ 21; Garofano Aff. at ¶ 28.

93. After returning from his leave, Vasta completed no on-line training. Vasta Dep. II at 37:24-38:2.

94. Nor did Vasta attend Garofano's Perspectives on Planning workshop held on October 18, 2005. Vasta Dep. II 39:16-18.

### K. After A Short Time, Vasta Began Working From Home Without Permission

95. In October 2005, Vasta began to periodically work from his home, rather than report to work in the Providence office as Garofano had assigned to do. Vasta Dep. II at 43:1-8.

96. Vasta did not ask permission to work from home, did not tell anyone at BAI that he was going to be working from home and did not call into the office on the days that he worked from home. Vasta Dep. II at 43:9-18.

97. Neither Hodges nor Garofano were aware that Vasta was supposedly working from home. Garofano Aff. at ¶ 29; Hodges Aff. at ¶¶ 23, 27, 28.

98. No other brokers in the Rhode Island market worked from their homes. Vasta Dep. II at 43:19-21; Garofano Aff. at ¶ 30; Hodges Aff. at ¶ 22.

99. Vasta left his BAI laptop at his Providence office when he worked from home. Vasta Dep. II at 88:23-89:2.

100. While working from home, Vasta had no access to his customer files or BAI's computer system. Vasta Dep. II at 43:22-24, 45:12-14.

101. Vasta did no other work while at home other than placing telephone calls to customers on his existing account list. Vasta Dep. II. 44:3-45:1.

102. During the time he was working from home in October 2005, Vasta applied for a position with another financial institution, Rockland Trust. Vasta Dep. II at 106:9-108:2.

### L. <u>BAI Separated Vasta From Employment Because, By All Accounts, He Had Abandoned His Position</u>

103. By early November, Garofano and Hodges took note that they had not seen Vasta in the office for some time. Garofano Aff. at ¶ 31; Hodges Aff. at ¶ 23.

104. On November 10, Garofano called Vasta's work telephone number and found that Vasta had not set up his outgoing voicemail message, even though he had returned to work nearly two months earlier. Vasta Dep. II at 135:13-15; Garofano Aff. at ¶ 32.

105. Shortly thereafter, Hodges checked BAI's IRIS customer relationship management computer system and observed that Vasta had recorded no contacts with customers since his return from medical leave.[8] Hodges Aff. at ¶ 24.

---

[8] BAI instructed its brokers record all interactions with customers on the IRIS system. Garofano Aff. at ¶ 35; Hodges Aff. at ¶ 25.

106. Hodges also reviewed records of Vasta's customer transactions, and observed that he had recorded fewer than 10 total transactions following his return from leave. Vasta Dep. II at 53:7-9; Garofano Aff. at ¶ 33; Hodges Aff. at ¶ 26.

107. In Vasta's own words, he "was not generating" business following his leave. Vasta Dep. II at 75:1-5.

108. Hodges and Garofano also took note that Vasta's BAI laptop remained in the Providence office from at least November 10 through 15, and that neither saw Vasta during that timeframe. Garofano Aff. at ¶ 34; Hodges Aff. at ¶ 27.

109. On November 15, Hodges and Garofano called Bank of America's Advice & Counsel department and explained Vasta's failure to attend the October 18 Perspectives on Planning session, his extended absence from the office, their inability to contact him through his BAI telephone number and his failure to set up his voicemail. Garofano Aff. at ¶ 36; Hodges Aff. at ¶ 28.

110. The Advice & Counsel representative confirmed with MetLife that Vasta had not requested additional medical leave. Hodges Aff. at ¶ 29.

111. Later that morning, Garofano reached Vasta on his cell phone and informed him that his employment was separated as of November 15, 2005. Vasta Dep. II at 65:15-68:15; Garofano Aff. at ¶ 37.

112. Vasta admits that job abandonment was the reason BAI articulated for his November 15, 2005 separation. Vasta Dep. II at 67:3-7.

113. Hodges played no role in BAI's decision to separate Vasta from his employment due to job abandonment. Hodges Aff. at ¶ 30; Garofano Aff. at ¶ 38.

### M. Vasta's Surgeries Were Successful In Eliminating Any Substantial Limitation He May Have Experienced

114. Vasta never required – or requested – an accommodation of any kind from any employer that he had ever worked with, including BAI and its predecessor, Quick & Reilly. Vasta Dep. I at 121:7-11; Vasta Dep. II at 20:18-21:4, 84:24-85:12.

115. Vasta testified that his knee impairments never interfered with his ability to work at any time either before or after undergoing corrective surgeries in 2005. Vasta Dep. I at 115:16-22, 117:3-6; Vasta Dep. II at 23:11-23.

116. Indeed, when asked if his production through the end of May 2005 was affected in any way by his knee problem, Vasta responded "No." Vasta Dep. I at 115:16-19. Vasta also stated that "the job that [he] had was a desk job, [so the knees issue] didn't affect [his] work." Vasta Dep. I at 117:3-6.

117. Vasta's 2005 surgeries were successful. Vasta Dep. I at 134:15-20; Vasta Dep. II at 10:20-11:6.

118. Following recovery from the knee surgeries, Vasta's knees did not limit his major life activities either inside or outside of the work environment. Vasta Dep. II at 23:11-24:2.

119. In fact, the only limitations Vasta articulated were his inability to play tennis – which he had not done in almost a decade prior to his employment with BAI – and his inability to perform squats with weights on his shoulders. Vasta Dep. I at 134:19-135:13; Vasta Dep. II at 16:22-17:6.

120. Vasta had no trouble walking after the surgeries were completed, and he never required a cane or any walking aids. Vasta Dep. II at 20:4-17.

121. Furthermore, by the time Vasta returned to BAI, he had no trouble showering, shaving, dressing, driving, walking to work from his parking spot, or climbing stairs, nor did he require any assistance to perform these daily activities. Vasta Dep. II at 18:8-20:17.

122. Vasta's physician, Dr. Cote, notified BAI that Vasta was cleared to return to work full time and without restriction on September 19, 2005. Vasta Dep. II at 15:4-16:8, Ex. 16.

123. Vasta last met with Dr. Cote for routine follow-up visits in December of 2005 and 2006, and he does not have to return for another checkup until 2008. Vasta Dep. II at 17:7-12.

**N. <u>Vasta Was Not Treated Differently Due To His Age</u>**

124. Vasta's poor work performance was in no way affected by his age. Vasta Dep. I at 115:5-13.

125. Vasta was 62 years old when Quick & Reilly hired him. Vasta Dep. I at 55:9-12.

126. While Vasta admits that Garofano never made any comments concerning his age, including during the telephone call in which he notified Vasta that he was being separated from employment, he nevertheless "absolutely" felt discriminated against because of his age. Vasta Dep. II at 70:13-19; 161:22-162:1.

127. While Vasta claims that Hodges' reference to him as, "Uncle Joe," was due to his age, he does not claim that the comment was discriminatory. Vasta Dep. I at 160:12-19.

128. At the time he was asked to cover Vasta's accounts and the Post Road and Bald Hill Road banking centers, Latessa was 49 years old. Vasta Dep. II at 77:21-78:1.

129. Vasta identifies two other financial advisors – in addition to himself – who he claims Garofano "wanted out": Chuck Martin ("Martin") and Jason Longtin ("Longtin"). Vasta Dep. II at 24:3-26:16.

130. Both Martin and Longtin were in their late twenties or early thirties at the time of Vasta's separation. Vasta Dep. II at 25:16-20.

131. Neither Martin nor Longtin suffered from a disability or took medical leave while employed as financial advisors BAI. Vasta Dep. II at 26:3-11; Hodges Aff. at ¶ 31.

132. Vasta testified in his deposition that he is only interested in how he is treated, not others at BAI. Vasta Dep. II at 82:14-21.

133. Vasta is not aware of anyone else who Garofano or BAI discriminated against on the basis of their age. Vasta Dep. II at 82:22-83:4.

134. When asked if Garofano discriminated against anyone else on the basis of their age, Vasta replied, "No." Vasta Dep. II at 83:1-4.

### O. Vasta Did Not "Blow The Whistle," Threaten To File A Lawsuit Or Bring An Administrative Charge

135. During his employment with BAI, Vasta never complained that he was being subjected to discrimination. Vasta Dep. I at 116:4-7, 160:16-19; Vasta Dep. II at 80:10-14.

136. During his employment with BAI, Vasta never threatened to file a lawsuit or administrative charge of discrimination. Vasta Dep. II at 80:15-22.

137. Vasta did not decide to bring the instant lawsuit until more than two months after his termination. Specifically, he testified: "I was terminated in November, and I didn't make the decision to even inquire about a lawsuit until sometime in late February, so it was not at the top of my mind." Vasta Dep. II at 80:15-22.

### P. Vasta Had Accrued A Commission Deficit At The Time of His Termination

138. At the time of Vasta's separation on November 15, 2005, he had accrued a commission deficit of $11, 363.88. Weiler Aff. at ¶ 3.

Respectfully submitted,

BANC OF AMERICA INVESTMENT SERVICES, INC.
By its attorneys,

*/s/ Mark A. Pogue*_________________________

Mark A. Pogue (#3341)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
mpogue@eapdlaw.com

Alice A. Kokodis (*pro hac vice*)
Brian P. Pezza (*pro hac vice*)
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100
akokodis@eapdlaw.com
bpezza@eapdlaw.com

Dated: October 5, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of October 2007, I caused a copy of the foregoing document to be delivered by U.S. mail and by operation of the Court's electronic filing system to:

Stephen T. Fanning, Esquire
The Law Offices of Stephen Thomas Fanning
350 South Main Street
Providence, RI 02903

_/s/ Mark A. Pogue__________
Mark A. Pogue