# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| JOSEPH VASTA, Plaintiff, | |
| v. | C.A. No.: 06-396-ML-DLM |
| BANC OF AMERICA INVESTMENT SERVICES, INC., Defendant. | |

**AFFIDAVIT OF CARYN HODGES**

I, Caryn Hodges, hereby depose and state the following, based on my own personal knowledge:

1. My name is Caryn Hodges. I am over 21 years of age and am a resident of the Commonwealth of Massachusetts. I am employed by Banc of America Investments, Inc. ("BAI"). I have worked for BAI or its predecessor, Quick & Reilly, Inc. ("Quick & Reilly") since February 22, 2000, and currently hold the title of Administrative Assistant III for the Rhode Island Market.

2. BAI, a wholly-owned subsidiary of Bank of America, N.A. ("Bank of America"), serves more than 1 million clients through a network of investment representatives and financial advisors in more than 30 states, including Rhode Island.

3. In April 2004, Bank of America merged with FleetBoston Financial, Inc., and, thereafter, Quick & Reilly became a part of BAI.

4. Joseph Vasta ("Vasta"), who had been employed as a financial consultant with Quick & Reilly, continued employment after the Bank of America merger as a financial advisor for BAI.

5. Initially, Quick & Reilly gave Vasta a book of business that had previously been serviced by a departed broker and assigned him to work out of an office at Fleet's Post Road branch in North Kingstown, Rhode Island.

6. At the time Quick & Reilly hired Vasta, it expected him to service bank customers and generate business, largely through referrals from bank branch personnel.

7. While BAI merged with Quick & Reilly in April of 2004, all phases of the transition to the BAI platform were not completed until in or around June of 2005.

8. BAI continued to train its financial advisors on the Perspectives on Planning tool and the other new BAI systems throughout the summer of 2005.

9. On August 29, 2005, Vasta called me and stated that he was ready to return to work from a medical leave he had taken. He asked me whether he would need to first meet with the new market director, Lou Garofano ("Garofano"). I replied that Vasta would have to meet with Garofano and scheduled a meeting for Garofano's next available appointment, which was September 6, 2005.

10. I later rescheduled the meeting to September 8 to accommodate Garofano, who could not attend the September 6 meeting due to the death of a family friend.

11. On September 13,2005, Vasta faxed me a return-to-work certification from his physician.

12. Vasta never told me that he thought the return-to-work certification was incorrect or that he disagreed with it in any way.

13. On September 19, 2005, BAI reinstated Vasta to the position of financial advisor in the Rhode Island Market.

14. Vasta remained subject to the same compensation plan (the BAI 2005 Financial Advisor Compensation Program) and remained eligible for the same employment benefits as he had been prior to his leave.

15. Because he was reinstated to the same position, Vasta's job encompassed the same duties and responsibilities and required the same skill and professional licensure as it did prior to his leave.

16. While Vasta's supervisor changed during his leave, the reporting structure did not – Vasta still reported to the Rhode Island Market Director.

17. BAI assigned financial advisor Stuart Latessa to cover Vasta's clients during his leave, but reassigned Vasta's former client list to him upon his return.

18. Not only did Garofano and I work out of the Providence office, but so did all but one of the market's sales assistants and more brokers were assigned there than any other location.

19. Vasta, like other brokers working in the Providence office, was assigned to a specific desk.

20. Even though I had assisted him in the past, and was available to help him upon his return, Vasta never asked for her help with any problems or concerns he may have had with the new BAI systems.

21. BAI had dozens of on-line, self-directed training modules that were available to its brokers.

22. No brokers in the Rhode Island Market were allowed to work from their homes and I am unaware of any brokers who did so.

23. By early November 2005, I took note that I had not seen Vasta in the office for some time.

24. Around that time, I checked BAI's IRIS customer relationship management computer system and observed that Vasta had recorded no contacts with customers since his return from medical leave.

25. BAI instructed financial advisors to record all interactions with customers on the IRIS system.

26. I also reviewed records of Vasta's customer transactions, and observed that he had recorded fewer than ten total transactions following his return from leave.

27. I also took note that Vasta's BAI laptop remained in the Providence office from at least November 10 through 15 and that I did not see Vasta during that timeframe.

28. On November 15, 2005, Garofano and I called Bank of America's Advice & Counsel department and explained that Vasta failed to attend an October 18 Perspectives on Planning session, he had been absent from the office for an extended period, the fact that we had been unable to contact him through his BAI telephone number and that he had failed to set up his voicemail.

29. The Advice & Counsel representative confirmed with MetLife that Vasta had not requested additional medical leave.

30. I played no role in BAI's decision to separate Vasta from his employment due to job abandonment.

31. Neither Chuck Martin nor Jason Longtin, two other financial advisors in the Rhode Island Market at the time of Vasta's employment, took medical leave while employed as financial advisors BAI.

I SOLEMNLY AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.

Caryn Hodges (signature)
Caryn Hodges

Dated: 10/5, 2007