# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOSEPH VASTA | : | |
| | : | |
| vs. | : | C.A. NO. 06-396-T |
| | : | |
| BANC OF AMERICA INVESTMENT SERVICES, INC. | : | |

**DEPOSITION OF JOSEPH VASTA**

Monday, May 7, 2007

10:30 a.m.

EDWARDS ANGELL PALMER & DODGE, LLP

2800 Financial Plaza

Providence, Rhode Island 02903

- - -

Lori P. Hamel, RPR, CRR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886

A. Mm-hmm.
Q. How long after the second time was the third time?
A. Probably four weeks, six weeks. It was -- everybody kept canceling.
Q. Were you sworn under oath at that time?
A. Yes. I'm not sure. I -- they may have said you're still under oath but I'm not -- I don't know if they did it again. I don't remember.
Q. Was anyone -- were these -- this testimony recorded in any way?
A. No, I don't -- no, I don't think so.
Q. Was there a court reporter there like there is today?
A. No.
Q. Did you notice any tape recording or other recording device?
A. I think they do use a tape.
Q. Okay.
A. I know they -- on the very first one that I went alone, they used a tape.
Q. Have you ever heard the tape?
A. No.
Q. Have you ever seen a transcript of the tape?
A. No.
Q. Let's talk a little bit about your employment history.

So after you graduated from Pace University, where was the first place you started to work?
A. Well, I was working with my father and my brother, they owned a half a dozen retail meat markets in Brooklyn and Queens, so I did that for a couple of years. And then I went in -- in 1968, I went into a training program for the investment business industry.
Q. Where did you take that training?
A. In New York. In New York City.
Q. Was that a school of some kind?
A. No, that was with a brokerage house.
Q. Which brokerage house?
A. Well, it doesn't exist. The Hayden Stone.
Q. Could you spell that for me?
A. H-A-Y-D-E-N, S-T-O-N-E.
Q. How long was the training?
A. Six months.
Q. And did you work for Hayden Stone after the training?
A. Yes. For about a year and a half.
Q. What did you do after working for Hayden Stone?
A. I went to Goodbody & Company.
Q. What is Goodbody & Company?
A. It's a brokerage house. It's been all brokerage since '68.

A. No. I don't have any of those records.
Q. Okay. What percentage of the -- your appointments in an estimate, if you could, what percentage were generated by the branch versus those generated by yourself?
A. About 75 percent by the branch at least.
Q. I believe you testified you had a minimum of 12 appointments per week that you had to do; is that correct?
A. Right.
Q. Did you -- how many appointments in a week do you recall that you averaged?
A. I averaged about 15.
Q. And what was the -- your compensation structure there?
A. It was straight commission.
Q. Did you get a draw?
A. A minimal, you know. I think it was a thousand or fifteen hundred a month.
Q. And how was -- how did that work? How did the mechanics of the draw work?
A. That if you didn't make enough commissions -- if you made zero commission they would give $1,500. If the next month you earned enough, say $3,000; well, they'll take their 15 first, 1500 first, and then you get -- it's like a loan.

start to look for another position?
A. Probably the middle of '04. About a year later. Because I tell you the truth, I liked it -- I -- I liked the company, but I was, you know. So I didn't really want to leave them.
Q. So, I want to make sure I get my timeline straight. I believe you joined Quick & Reilly in January or February of 2004?
A. That's correct.
Q. Does that sound about right?
A. Yeah, did I give the wrong date? No, okay. February '04. That's -- all right. I'm confused on my dates.
Q. Okay. Well, let's just take it step by step. So you -- when did they take away your branches as you recall?
A. It had to be '03 then. Did I say '03? I'm confused.
Q. I believe you said the --
A. I'm confused, hold on a second.
Q. -- middle of '03. Is there something -- I'm not -- is there something on your tax return that would help you with that?
A. That's what I'm looking at. Probably -- yeah, it was '03. The middle of '03.
Q. Okay. So approximately how many months before you started looking for --

Q. What did you discuss at the interview?
A. He discussed the territory that was -- he had two territories available.
Q. What territories were those?
A. North Kingstown and Warwick. And then he had Warren and I think Tiverton.
Q. Was there any particular territory in Warwick? Was it --
A. The branches. They had a bank branch on Market Street in Warren, and then they have a branch somewhere in Tiverton.
Q. I see. So when you say territories, you're speaking about bank branches?
A. That's correct.
Q. Okay. North -- the first one you mentioned was North Kingstown?
A. Post Road they call it.
Q. How about Warwick?
A. Bald Hill.
Q. And where was the one in Tiverton?
A. I'm sorry?
Q. The Tiverton?
A. I have no idea where it is.
Q. Was -- did -- what else did you talk about other than

the territories that he had available?
A. No, he was mentioning that this alleged book of business that was there, which really was a myth. And it sounded good.
Q. When you say alleged book of business, first of all, where was the book?
A. The book of business was between the Bald Hill branch and the Post Road branch.
Q. Why do you say it was an alleged book of business?
A. Because it wasn't a book of accounts that were active or anything in the market. What it was is, it was a -- it was a recording of every transaction that was done in that branch, and that's it. These people spent their money. They invested -- most of these people you could track -- you could track their -- the fact that they retired and the big investment was to roll over the 401(K), and then two years later there was another investment because they sold their primary home and they had money left over. And then when I would call them, the only thing they were interested in is they were no longer in the accumulation phase. Now they were -- they were in the distribution phase. And I found myself for the first six months, every time -- every one of those customers I called, I had paperwork to do. Whether they

were turning 70 and a half and they wanted to -- they had to take their mandatory, uh, money out of their -- out of their retirement accounts and stuff like that. It was just like -- it was all -- all paperwork, all clerical work, and no business. So whatever I generate -- whatever was generated, what little was generated over that period of time by me, was generated by me. Because I could not -- every -- most of my appointments that were made were all service work.
Q. And who had this book before you got it?
A. It was -- I don't know. I don't know the person.
Q. Okay.
A. An individual that left.
Q. Okay.
A. That left Quick & Reilly.
Q. Let's take a step back and talk a little bit more about before you came onboard at Quick & Reilly. So, was there -- was there anything else that you talked about with Anthony DiNovella?
A. Not really. I mean, we were talking basically about the position.
Q. I'm sorry?
A. No, no.
Q. Did you talk about any -- did you talk about any -- your

age?
A. No.
Q. Did you talk about any disability or impairment you might have?
A. No.
Q. Did you talk about whether you may need an accommodation for anything at all?
A. No.
Q. And what was -- so what was your age at the time you were applying for this position with the bank -- with Quick & Reilly?
A. I guess I was 62. Yeah.
Q. Have I exhausted your memory of everything you talked about with Mr. DiNovella?
A. I think so. I don't know. Unless you have some information that I don't have. I have no idea.
Q. All I want to know is what you can remember.
A. No.
Q. Okay.

*(Defendant's Exhibit 2 marked for identification)*

Q. Mr. Vasta, I'm handing you what has been marked by the court reporter as Exhibit No. 2. Can you take a moment and review that.

A. Mm-hmm.

*(Witness perusing document)*

A. All right.
Q. Do you recognize this document?
A. Yeah.
Q. What do you recognize it to be?
A. It's an application.
Q. Application for what?
A. I would imagine employment.
Q. On the first page it's a FleetBoston Financial Employment Application?
A. Yes.
Q. And is this your Quick & Reilly job application?
A. Mm-hmm.
Q. If you look on the last page, is that your signature down the bottom of the page?
A. Yes.
Q. Okay. As far as you can tell, does this appear to be a true and accurate copy of your job application?
A. Yup. Yes.
Q. Did you -- is it ordinarily your -- strike that.
Did you read the application before you -- as you were filling it out and before you signed it?
A. Mm-hmm.

Q. And can you please read for me or read for the record on the last page the last bullet point immediately before your signature?

A. Yes. "I understand that if I'm hired, I will be considered an at-will employee."

Q. Okay. And did you understand what that meant at the time?

A. Probably not. No.

Q. Do you have an understanding what "at-will employment" means?

A. No.

Q. If you look up at the first bullet on that last page, I'll read this and please tell me if I read it correctly.

"This application is not a contract of employment between the Company and any person, nor does it give any person the right to continue in the employment of the Company for any specified period of time. All employees are employees at-will and are free to resign or to be terminated without notice at any time and for any reason."

Did I read that correctly?

A. Yup.

Q. And this is also before your signature on the page?

A. Mm-hmm.
Q. Do you remember reading it at the time?
A. I don't remember reading it but I probably did read it.
Q. Did you understand that that was the arrangement?
A. Mm-hmm.
Q. Okay, that's a yes?
A. Yes.
Q. Okay. And then if you could turn to the third page of the application. What's listed -- well, what did you write on the third page, can you describe that?
A. I guess the last -- whatever the question -- well, there must have been a question about how many years -- well, these are the firms I worked with before.
Q. Okay, so you listed your prior employers?
A. Yes.
Q. And you listed reasons for leaving three out of the four employers you listed; is that correct?
A. Mm-hmm.
Q. Which -- did you list a reason for leaving IFMG?
A. No, I didn't.
Q. And why didn't you?
A. Because I probably just forgot to.
Q. Okay. So how were you informed that you got the job at Quick & Reilly?

A. I had a second interview with Anthony DiNovella, and he offered me a job.
Q. What did you discuss at this meeting -- at this interview?
A. I really -- I don't remember, to tell you the truth.
Q. Did he offer you the job straightaway or was it at the beginning of the interview or at the end?
A. I think it was at the beginning but I, you know, I really -- I don't know.
Q. Do you remember discussing any -- discussing your age at this meeting?
A. I always volunteered my age anyway so, I know he didn't ask it but he knew it. I probably told him.
Q. Do you -- but you don't remember one way or the other whether you actually did?
A. No.
Q. Okay. How about at the second meeting, did you talk about any need for accommodation that you may have?
A. No.
Q. Any physical or mental impairments that you might have?
A. No.
Q. And what was the -- what was the position that was offered to you?
A. It was a financial adviser, covering the Warwick -- the

Bald Hill and the Post Road office, with Post Road being my hub.
Q. And that's Post Road, North Kingstown?
A. That's correct.
Q. And what were your understandings of -- understanding of your job duties at the time of your hire?
A. Essentially service the bank customers, generating business. That's basically the simplest form of answering that question as far as, you know, that's what you have to do. Service customers and generate business.
Q. And what was your understanding of where the business would come from?
A. There was a combination of my work in the book, and appointments being made by the branches.
Q. Before you started, did you have a belief as to what percentage would come from the branches?
A. No. I assumed the program was similar to the program that was at Sovereign Bank.
Q. Okay.
A. But it was not.
Q. Okay. So -- but before you started, you assumed it would be the same sort of --
A. That's correct.

Q. Same arrangement, roughly the same percentage as from Sovereign?
A. Right.
Q. Did you -- in the course of your applying for the position, did you make any representations to Quick & Reilly of what your prior performance or prior production had been?
A. I gave my production numbers all to Anthony.
Q. Okay.
A. Prior to the first meeting.
Q. Okay.

*(Defendant's Exhibit 3 marked for identification)*

Q. I'm handing you what's now been marked as Exhibit No. 3. Can you please take your time and review that.

*(Witness perusing document)*

Q. Have you had a minute to review it?
A. Mm-hmm.
Q. Have you ever seen this before?
A. Yes. This is -- I think these are -- yeah, these are the numbers I gave to Anthony.
Q. Okay. And what did you -- what did you tell Anthony about your past performance -- past production?
A. What do you mean? This is it. I gave him my numbers.

Q. Okay. Did you make any representations of what numbers you would have going forward?
A. No. No, well based on -- based on the asset base of both branches and everything else like that, the numbers -- it appeared that the numbers would have been much higher, you know, if the system was the same, which she wasn't so.
Q. Okay. How much did you expect in -- that you'd be bringing in in gross production?
A. At least 400,000 the first year.
Q. Did -- was this Anthony's -- Mr. DiNovella's expectation as well?
A. I think so.
Q. Did you ever discuss that?
A. Yeah, I think we discussed it, I'm not a hundred percent sure.
Q. Did you talk -- even if you didn't talk in specifics, did you speak in general terms about what the gross production would, would be -- what your gross production expectation would be?
A. Yeah, because I had just come off -- January of '04 was my biggest month ever at IFMG. I had come off my biggest month and I was all excited to go to Quick & Reilly and do even better, and it just didn't

materialize.
Q. So at the time of hire, what was your understanding of the compensation structure at Quick & Reilly?
A. Well, for the first 18 months I was -- well, I had a guarantee for the first -- I think it was six months, I'm not sure. And -- was it six months? I'm not sure. It's either three or six months, I don't remember. And then for the first 18 months, it was a 50 percent payout on your commissions. And that was the understanding.
Q. Were you -- did -- was there a draw involved?
A. Mm-hmm. Yes.
Q. Okay. And what was your understanding of the draw before you got started at Quick & Reilly?
A. A draw is a draw. There's no understanding. It's -- it's what it is.
Q. So the same is -- treated the same as --
A. Anybody else, a draw is a draw.
Q. It's the same as you had back throughout --
A. From 1968, right.
Q. Same thing.
A. Right.
Q. Okay.

*(Defendant's Exhibit 4 marked for identification)*

Q. I'm handing you what's been marked as Exhibit 4. Have you had time to --
A. Basically, yup.
Q. Take as much time as you need. Let me know when you're ready.

*(Witness perusing document)*

A. Okay, it was three months.
Q. What was three months?
A. No, I'm sorry. I can't remember how long the guarantee was. I thought I saw it here but it's not.
Q. So if you've had enough time to look at it, what is Exhibit 4?
A. What is it? It's a letter informing me that I was -- well, welcoming me as a new employer -- employee. And also the breakdown of compensation. Various bonuses that you get at certain plateaus.
Q. Okay. And I imagine you would have -- you read this before --
A. Mm-hmm.
Q. -- you started at Quick & Reilly?
A. Right.
Q. Did you have any questions about it?
A. No.
Q. If you look on the last page, is that your signature on

the last page?
A. Yes, it is.
Q. And what's the date that you signed it?
A. 2/5/04.
Q. Okay. If you can look at the second page, down at the bottom, the last -- the last two sentences of the second page, I'll read that, let me know if I read it incorrectly.
"The offer of employment does not constitute an employment contract for any specified period of time. You acknowledge that you are an employee at-will and that you and Quick & Reilly are free to terminate the employment relationship at any time."
Did I read that correctly?
A. Yes.
Q. Was that your understanding at the time you started?
A. Yes.
Q. Okay. If you look up to about the middle of the page -- the second page of Exhibit No. 4, there's a paragraph that describes the draw?
A. Mm-hmm.
Q. Could you read -- I'll read that as well.
"The draw you receive is an advance against the anticipated compensation you will earn by producing

revenue. The draw is not a salary. In the event your net incentive compensation for any production month does not exceed your draw, a deficit will accrue and you acknowledge that Quick & Reilly has the right to offset your deficit with any future incentive compensation payments."

Did I read that correctly?

A. Yes.

Q. And that was just the same as any other draw that you had; is that right?

A. Yes.

Q. Nothing surprising about it?

A. No.

Q. Okay. Was there anything in the terms and conditions of your employment as you understood them with Quick & Reilly that was not reflected in the offer letter and the compensation documents?

A. Not that I recall.

Q. So did you -- by signing this last page, did you accept the offer of employment?

A. Yes.

Q. On the terms that are specified in Exhibit 4?

A. Yes.

Q. Okay. If we could just -- if you would please go back

Q. Where was Anthony DiNovella's office?
A. Right at 111 Westminster.
Q. And was that the headquarters for the region?
A. I believe so, yes.
Q. How many financial advisors were in the region?
A. Don't know.
Q. What were your job duties when you first started out?
A. My job duties were I was a roaming broker for the Post Road and Bald Hill. And essentially was to, A, work the book; and B, generate more business. Business.
Q. And what hours did you keep?
A. Usually the bank hours. You know, I used to get there just before opening. I used to get there about 8:30, 20 of 9. And then -- it depended -- you know, like it depended on how late we had appointments. It was different with Fleet than it was like when I was with Sovereign because Fleet we were bank employees and we were allowed to stay after hours. You know, and as a matter of fact, I had a key to both my branches, and one of them had an alarm system that I had the code for.
Q. Which one was that?
A. Post Road. But I never left before the branch closed.
Q. Did you ever get to the Post Road branch -- were you ever the only one there?

Q. Okay. How about -- how else would you generate business in addition to making phone calls to people on the book?
A. No, it was that and if I got referrals.
Q. Referrals. What type of referrals?
A. From the branch people.
Q. How would that work?
A. Well, say if they had an individual that, say, had a CD that matured and they didn't like -- rates were very low anyway at the time, CD rates. And usually substantially lower than what was maturing. And then, you know, then they would offer to set up an appointment with me to show them an alternative.
Q. Okay. This is in 2004?
A. Yeah.
Q. Okay. Would you -- is that -- so that's a branch referral?
A. That's correct.
Q. Okay. Did you get referrals from anyone else in 2004 beyond the branch?
A. No.
Q. When you met with customers, where did you meet with them?
A. At one of the desks in Bald Hill, one of the cubicles. And then in -- on Post Road in my office.

A. It generally worked like I would ask for a referral, and -- but usually it was like, you know, I was talking to a friend of mine and he's looking to make a change, or something like that.
Q. Did you ever cold call people?
A. No.
Q. Did you -- strike that. Could you describe for me your interaction with the employees at the branches?
A. I never had a problem with anyone. I mean --
Q. What were your daily interactions like with them? Did they -- were you -- did you -- were you separate from them or were -- or were you working collaboratively with them?
A. Yeah, we worked together. It -- my -- because I needed them for referrals, I made it my point that every day when I had lunch at the branch, I would go at different times because different people were on break and I used to go to the break room just to, you know, chat with the various employees. That was my mission was -- because I considered them my customers also, and so that's -- so I was friendly with everyone.
Q. Would you get referrals just from the platform people or from tellers as well?
A. Well, tellers was supposed -- you know, they -- the

personnel at the bank wasn't as trained as, you know, or incented as they were in Sovereign. But, you know, the tellers, what the tellers were supposed to do is if someone, you know, deposited, you know, a $50,000 check, they were supposed to say, you know, why don't you set up an appointment with our investment person, you know. Things like that. That's -- those are the things you were looking for.

Q. Okay. So --

A. But they couldn't tell me directly that Brian Pezza just gave me $50,000 because then that violates the wall that's supposed to be between us.

Q. So primarily you would get your referrals from the platform people?

A. Mm-hmm.

Q. But you would also work with the -- occasionally with the tellers?

A. That's correct.

Q. Are there any other employees at the bank that you would get referrals from?

A. No, the manager, the branch manager, I mean it's all, you know.

Q. Okay. And you said a moment ago that, that at Sovereign, the bank employees were more incented to

provide you with referrals?
A. Right.
Q. What do you mean by that?
A. They had goals. They had to provide -- each branch had to provide X amount of appointments in a quarter, X amount of dollars in a quarter, and as they hit their goals, they got some kind of a bonus. I don't know what it was. But it was part of the five goals that they have, which is like checking accounts, deposits, and you know, whatever else they do. CDs. You know. And that was -- the investment part of it was one of the major -- five major goals of the bank. And it was quarterly and, you know, that's why we got a lot of referrals.
Q. So how is it different at Quick & Reilly?
A. I think they eliminated the program when Bank of America was taking over.
Q. Okay.
A. They came out with this Premier Banker.
Q. When you say -- what do you mean when you say eliminated the program?
A. Well, they weren't being incented anymore to, to make referrals.
Q. The branch personnel?
A. Right. So, you know, you take away an incentive, then

why bother.
Q. Do you -- do you remember when that program was --
A. It probably started in --
Q. -- cut off?
A. -- November '04 when the Premier Banking Program started. I'm not a hundred percent sure.
Q. But as you recall, it was in that general time frame?
A. Yes.
Q. Fall -- fall of '04?
A. Right.
Q. Or -- or winter?
A. Fall of '04.
Q. And it's your understanding that that was in connection with the Bank of America takeover or merger with Quick & Reilly?
A. Yes.
Q. Okay. Who did you work with or who did you work with from the branch head -- the headquarters at 111 Westminster?
A. Who did I work for?
Q. Did you work with anyone there?
A. No. I mean -- well, I mean -- my manager or?
Q. Let's start -- how often did you interact with your manager?

Q. You shook your head, that's all.

Could you -- how do you characterize your 2004 production?

A. It was terrible.

MR. FANNING: I'm sorry, it was what? I missed that. What did you say?

A. It was terrible.

MR. FANNING: Terrible.

Q. Do you know how you fell relative to others in the region?

A. No. I was probably towards the bottom.

Q. Was there anything that Quick & Reilly did that caused you to have a terrible year?

A. No. What happened was, I started to pull it together after the summer, I had a decent October, and then the Premier Banking Program started on November 1. And that was supposed to be a partnership between the broker and a bank partner. And so we had to supply a list of people that I think had investable assets of over a hundred thousand, and I put my list together because I was really looking forward to this relationship. And it turned out that my Premier Banker, who didn't last in the position a year, I found out later on that she would only get incented or points or whatever the compensation

was, if we brought in new dollars. So she systematically cleaned out all my accounts of cash, because she could see the banking side, and put -- between November to January she put about $3 million in, in actual cash into CDs, and I -- that was my whole production. And she took about $150,000 in production out of my pocket.

Q. So she -- so, if I understand, she -- she took a customer's invested assets and put them into savings accounts or similar?

A. What I did -- I'll tell you, I'll give you one -- I had an appointment the day after Election Day in November of '04. I had done business with this woman during the summer, I put her in a Mutual Fund that was, on an annualized basis was averaging over 20 percent. So now she was happy, she came in, she just -- she retired, she was a dean of something at URI, and -- and she had a $1.1 million rollover, and then about four or five hundred thousand in cash. So I set the appointment, I did my homework, the whole bit, and we met with the Premier Banker.

Q. Okay, can I pause you for a moment?

A. Sure.

Q. What was your Premier partner's name?

A. That meeting was probably in November.
Q. It was that --
A. It was shortly after, you know, because when we had some kind of -- we used to have the meetings where the reps and the Premier Bankers used to have to go to once a month. So if it was -- it was either the end of November or the beginning of December, that I...
Q. So shortly after you started working?
A. Shortly after, yes.
Q. Okay. The customer in -- the January customer, day after New Years, the son who came in, where was that -- where was he from?
A. Post Road. North Kingstown.
Q. Residence, street address would be in North Kingstown?
A. I believe so, yes.
Q. Okay. And how about the February account that we just discussed?
A. February, I did the original -- I did the original transaction out of the Warwick branch.
Q. All right. And where was that customer from?
A. I think she lived in Warwick. I'm not sure.
Q. Did you ever complain to Scott or anyone after November or December 2004?
A. Well, Scott left, okay? He's -- and Anthony DiNovella

would -- Caryn Hodges would probably know. November, December. I have no idea.

*(Defendant's Exhibit 5 marked for identification)*

Q. Handing you what's been marked as Exhibit 5. Can you look in this -- in the sent line of the e-mail on the first page. About halfway in the middle of the paragraph, do you see your name there?
A. Yes.
Q. Okay. And this is an e-mail sent from Caryn Hodges on December 29, 2004?
A. Right.
Q. Is that --
A. That's what it says, yeah.
Q. Okay. Subject is Gross Revenue; is that correct?
A. Yes.
Q. And do you remember receiving this e-mail?
A. No. But I obviously did so.
Q. Do you have any reason to think that you might not have?
A. No.
Q. And if you look, I believe -- your production total year to date revenue for retention bonus that follows -- on the chart on page 2, your gross production reads $98,836.78. Is that correct?

A. If it's here, it's correct.
Q. Does that comport with your recollection of what your production was for 2004?
A. I mean, I know it was in decline. So this is probably accurate.
Q. Okay. Did you have any training in connection with the new models that Bank of America was putting out?
A. Yes, all of them. I spent -- well, besides what we did locally, I spent two days doing an overnighter in Connecticut. Then a week before, just before I went on medical leave I had an overnighter in Boston. Two days of training. And then there was other stuff, I believe. State stuff. But I know I had the two overnight things.
Q. So it was a -- it was a substantial change then, was it, from the Quick & Reilly model to the Bank of America model?
A. Yes, whole different platform.
Q. Okay.

*(Defendant's Exhibit 6 marked for identification)*

Q. I'm showing you now what's been marked as Exhibit 6. You can see that there's a -- there's an arrow drawn next to your name on these charts. Do you -- you -- could you please take a look at the columns, the column

headings at the top and, and state whether you recognize any of the column headings as training sessions that you went there.

(*Witness perusing document*)

A. You want me to answer which ones I went to?

Q. Well, if you can follow along, it looks like you -- this chart would state that you attended Asset Based Products?

A. Right.

Q. Do you -- do you recall -- is that correct?

A. Yes.

Q. Ethics and Sales Practices?

A. Yes.

Q. Is that correct? Did you attend the Wave 4 Classroom attendance -- classroom sessions?

A. I don't know. I don't know what the Wave 4 is so I have no idea.

Q. Okay. Perspectives on Planning for Financial Associates, did you attend that?

A. Yes.

Q. And what is Perspectives on Planning?

A. It's actually -- it's a whole series of questions where you, you know, it's like -- it's a financial soul searching from A to Z as far as a customer's concerned.

Q. Soul searching?
A. Yeah, you give your confession, everything you owe and you get and that kind of stuff. It's, you know.
Q. Was it --
A. If it's done properly, it's a good tool, you know. If you have your tax returns, you got everything, you know, if you want to really be -- if you want to really be honest with yourself, it's a good tool.
Q. So it's an investment analyst -- analysis tool?
A. Well, it's supposed to -- you know, you put projections in there and you're supposed to -- you know, and it will tell you what -- where you're deficient and where you're not deficient.
Q. Is it a -- is it a book? Is it a software program?
A. It's a software program, and then you got a printout and then it's bound and.
Q. When you say -- that -- when you say "you" get, do you mean you would give to customers?
A. Well, yeah. You -- if you did one of these with the customer, then you would review it with the customer and it's basically their bible.
Q. Okay. And you were trained on this program?
A. Yes.
Q. Did you put together Perspectives on Planning for any

Perspectives on Planning should be done for a customer?
A. I don't know.
Q. Would that have been part of the training that you went through back in 2005?
A. Well, I was trained to use the system so, you know.
Q. Okay. But you're not sure what the -- whether there were criteria?
A. No.
Q. Okay. If you can flip to the second page, again these are -- these depict additional training sessions in March and June of 2005?
A. Right.
Q. It appears that you -- these -- this chart reflects that you attended Fund Strategies, Advised and Portfolio Edge. Do you recall attending that one?
A. I mean, I -- no, this is like two years ago. I have no idea. If I -- if I'm marked off -- we always had a sign-up sheet, so if I'm marked off I did attend it.
Q. So you have no reason to think that -- you have no reason to think that if it's marked on this sheet that you attended, that you in fact did not attend?
A. No, if it's marked on the sheet that I attended, I attended.
Q. Okay. Fair enough. Did you do any Web-based training?

A. Yes. I was current until I -- you know, until the end of May. Whatever -- whatever -- well, we used to have to do these -- I don't know what they call them. Continuing Ed modules, some kind of modules. We used to have to do a couple a month, and I was current until, you know, up till the end of May.

Q. And at the end of May is when you went on your leave; is that right?

A. That's correct.

Q. Okay. How many sort of -- you had to do a couple a month, you said? I'm sorry.

A. Yeah, they used to back up on you. When you thought you were done, you'd receive two more.

Q. With the BancBank of America transition, did you get -- were you given a copy of the BankBank of America Associate Handbook?

A. Probably.

*(Defendant's Exhibit 7 marked for identification)*

A. Now, are you going to ask me if I read this from cover to cover?

Q. Do you remember receiving a copy of Exhibit 7, the employee -- Associate Handbook 2005.

A. I don't remember receiving a copy, but if they say they

gave it to me, you know, I'll accept it. I mean...
Q. Were you aware of whether the contents of the Associate Handbook were available on the BancBank of America Intranet?
A. I think -- I think I was aware of that, yes.
Q. Did you ever refer to -- did you ever go online and look at parts of the handbook?
A. No.
Q. But you knew it was there?
A. Yeah.
Q. Okay. Okay, you can put that aside.
Were there any compensation changes with the transition from Quick & Reilly to BancBank of America?
A. I don't know.
Q. Do you need to take a break?
A. I don't know I said.
Q. I'm asking, do you need to -- would you like to take a break?
A. No.
Q. Okay.
A. Do you want to take a break?
Q. I could go all day.
A. Oh, thanks. Actually, I could use some water.
MR. PEZZA: Let's take a break.

there.
Q. Right, I'm asking you just to focus on May.
A. Okay.
Q. And is it possible that May is -- while there are no numbers for January or February or March or April, isn't it possible that what's listed as May is year-to-date, considering, for instance, Joseph Hassett had 360,233 in one month? Is it --
A. Joe Hassett is a million dollar producer so I have no idea what these figures are. If they're year-to-date or a month.
Q. Okay.
A. It's just listed under one month here. And then there is a column at the end Year-to-Date. So...
Q. I understand. Was it -- where was it -- was it -- strike that.
At the time you went on medical leave, do you know what your ranking was among the brokers in the region?
A. Yeah, probably near the bottom.
Q. Okay. And why was that?
A. Well, I -- basically mentioned earlier the problem I was having with my Premier Banker, and essentially there was no one in management I could talk to.
Q. Were you getting -- so, and you had stopped getting

referrals from --

A. Right.

Q. -- branches?

A. That's correct.

Q. Okay. Do you think that your production prior to your leave had anything to do with, with your age?

A. With my age?

Q. Yes.

A. I don't understand that question.

Q. Okay. Did the fact that you were toward the bottom in production, was that caused in any way by the fact -- by what -- by your age?

A. No.

Q. Okay. That's -- it wasn't a trick question.

A. No, I have no -- yeah.

Q. Was your production through May, through the end of May '05 affected in any way by your problems you were having with your knees?

A. No.

Q. But was it affected in any way by problems you were having with your shoulder?

A. No.

Q. Was it affected --

A. Well, I did have shoulder surgery in March.

Q. Okay. And were you -- did you miss any work?
A. I -- it was -- no, it was on the Thursday and I was back to work on Monday.
Q. Okay. Do you claim that any -- that there was any discriminatory action taken by the bank that affected your production prior to your leave?
A. No.
Q. Okay. So let's talk about your decision to have your knees operated on.
A. Right.
Q. When did you make the decision?
A. I had an appointment with my orthopedic doctor in middle of February, okay, and I was really having problems. And none of the medication was working. I was on maximum Celebrex that I could possibly take and, you know, and so it -- so I -- and he told me it was time. We were putting it off for like five years.
Q. So could you describe, please, what your -- what your symptoms were prior to having surgery?
A. My knees constantly were throbbing. As a matter of fact at night, I'd have to put warmups on and sleep on top of the covers because the weight of the blankets were too -- would hurt my knees too much. That's how bad my knees were.

Q. Did it affect your ability to do -- to walk?
A. Yes, of course. I mean, I walked in pain all the time.
Q. How about -- how else did it affect you, your daily life?
A. Well, the fact that, you know, the job that I had was a desk job, it didn't affect my work. But, you know, it's just like if I got up, it was -- and walked to my car or walked somewhere else, I mean, it hurt.
Q. Okay. Did it affect your ability to drive?
A. No.
Q. Did you ever have to -- I'm gonna list a series of activities that have been identified in this case and I'll ask you whether you've had -- for each one I'll ask you whether you've had any difficulty with them prior to your surgery. Bending down?
A. With my knees?
Q. Yes.
A. Impossible. No, I could not bend down.
Q. Stooping over?
A. Anything involving the bending of the knees. I mean, if I had to bend over this way, that was not a problem because I -- but anything that had to use my knees was a problem.
Q. Was it -- could you do it if you had to?

Q. Have you gone to Dr. Yerneni --
A. No.
Q. -- to request your medical records? Have you gone to any of your treating physicians at all to get -- request your medical records?
A. No.
Q. Okay. Prior to your going out on leave to have surgery, did you request any accommodations at work?
A. No.
Q. Did you need any accommodations at work?
A. No.
Q. Did you make the decision to have both knees done at the same time, or did you -- when did -- what did you decide -- when did you decide to have your right knee -- is it your right knee you had first?
A. First my right.
Q. When -- did you decide to have them both done?
A. I asked the doctor if he could do both together and he says he would not do them both together. Because he says, "I'm not joking when I say this, it's gonna sound like a joke, but if I do them both together," he said, "you're not going to have a leg to stand on," in that you really need the other leg to support yourself, with a walker in the beginning or crutches or whatever. So

that's why he said he would only do that under extreme emergency. So I had the right one done first, and then six weeks later I had the left one done.
Q. When did you make the decision to have the left one done?
A. Together. The decision was --
Q. You made one decision to have both knees done, and your doctor determined the order in which they would happen?
A. That's correct.
Q. Okay. And why did you wait until May of 2005?
A. Because I had a torn rotator in my right arm, and that had to be repaired or else I couldn't use my crutches. So that had to be done first in March before I could get my knees done.
Q. How did you tear your rotator cuff?
A. I have no idea. I -- it's a mystery.
Q. Did you ever take a leave of absence from any of your prior employers?
A. No.
Q. How did you notify the bank that you needed surgery?
A. I contacted Caryn Hodges, I asked her what the procedure was, and she gave me the number for Human Resources. I called Human Resources and they transferred me over to MetLife. MetLife is -- I guess has the -- not I guess.

Has the disability policy for the bank. And they sent me a kit that I had to fill out everything. And the second half of it my doctor had to fill out and send back to MetLife. And they basically came back and told me how much each operation -- how much time for each operation, and what the benefit was and everything else like that. I had no input with that, they just -- they did that. When I had my first knee done, it was eight weeks. But since there was a two-week overlap, they extended the second knee to six weeks.

Q. Okay.

A. And that's it.

*(Defendant's Exhibit 9 marked for identification)*

Q. Handing you what's been marked as Exhibit 9. Take a minute to look it, please.

*(Witness perusing document)*

Q. Tell me, is that the packet that MetLife sent you?

A. Yes, it is, it's got my signature.

Q. Now, do you still have a copy of any of the pages comprising this exhibit?

A. No. What do you mean, at home?

Q. Yeah.

A. Do I have a copy? I don't know. I really don't know.

Q. Okay. So, did MetLife mail this directly to your home?
A. Yes.
Q. That's how you got it? Did you read it when it came in?
A. Yes.
Q. And what did you do after reading this?
A. After I filled out my part, I took -- I gave -- I went to my doctor's office and he did his part, and I put it in the mail. I wanted to make sure it didn't sit around the office. So I went on a day I knew he was there and, you know, he did what he had to do and I mailed it out.
Q. So you understood that at the time you asked -- you submitted this, that you were making a request for family medical leave?
A. That's correct. No. Family medical leave? I had no idea what that was at the time.
Q. Okay. But --
A. I just was -- I -- I just was putting it out for medical leave because, you know -- because I was having my knees done. I had no idea of anything.
Q. Okay. But this is -- but then MetLife sent this to you?
A. That's correct.
Q. And you read it?
A. Yes.
Q. Okay. So take a look at page 3. Okay? Do you see the

title, it says your Rights and Obligations Under the Family and Medical Leave Act?
A. Yup.
Q. Okay. So, it's fair to say that after you received this and read it, that you had an understanding of what it was that you were requesting from the company by way of leave?
A. I never really looked at Family Leave Act. I just was looking at whatever it was gonna take for me to, you know -- for me -- for the surgery and the rehab and the getting back. That's all I looked at. I mean...
Q. Did you understand that there was -- that there were laws that would allow you to take a certain amount of time away from work for purposes, including having surgery, that would entitle you to get your job back?
A. This is going to be a stupid answer but I thought it was just for maternity that the woman or the husband could share the 12 weeks. I didn't think it was for surgery or anything else like that.
Q. Okay. At some point did you become aware of the fact that there were such laws that would apply -- that may apply to you?
A. Yeah, after the fact.
Q. Okay. And, let's see, if you could turn to the second

page. Let me ask you, what was your understanding at the time you requested leave, if you had an understanding, of what you would have to do once you were ready to come back?
A. I just assumed that I had to call Caryn Hodges, which I did, to say I could come back. And the day I called her I asked her if I was to report to my office in North Kingstown or I had to meet the new manager who was -- Mr. Garofano got there after I was already on leave.
Q. Okay. Let's -- if I could, and I understand where you're headed. I would like to just --
A. Okay.
Q. Let's just stay with the request and we'll get there, we'll go step by step.
A. Okay.
Q. So at the time you requested leave or you got this packet from MetLife, you assumed you would just call Caryn once months down the road your leave was up?
A. Right.
Q. Okay. And when you got this, if you could take a look at page 2, and do you see the one, two, three, fourth paragraph down, it says Job Reinstatement?
A. Right.
Q. And do you see where it says there: "You will be

required to present a fitness-for-duty certificate prior to being restored to employment. If such certification is not received, your return to work may be delayed until certification is provided." Is that -- did I read that correctly?
A. You read it correctly, yes.
Q. And that's -- and then also, if you would look down the last paragraph, it's -- does that state: "For more information on the FMLA, refer to the enclosed documents and your Associate Handbook."
A. Okay.
Q. I read that correctly?
A. Yes.
Q. Now, did you ever refer to the handbook --
A. No.
Q. -- to -- okay. Did you talk to anyone about any questions that you may have had about the information presented to you in this packet from MetLife?
A. No.
Q. Did you have any questions?
A. No.
Q. If I could ask you to take a look back at Exhibit 7. Giving you the abridged version. I'll refer to the page numbers from the actual document, though. So if you can

next page, still under the heading now on page 127, it's -- the first paragraph, could you read to yourself that first paragraph?
A. Yes.
Q. Okay. Now, is it fair to say that the 2005 BankBank of America Associate Handbook required employees coming back from FMLA leave to submit a return to work certification?
MR. FANNING: I'm going to object because it speaks for itself, but you can answer it if you can.
A. Yeah, it -- it appears that way, yes.
Q. Okay. Was your leave request approved?
A. I guess so. I mean, yeah, I would imagine it was.
Q. Did you go on medical leave?
A. Yeah, I went on medical leave so it was approved. I mean, it's obvious it was approved.
Q. How did you find out that it was approved?
A. I have no -- I don't remember.
*(Defendant's Exhibit 10 marked for identification)*
Q. I'm handing you what's been now marked as Exhibit 10. And I'll represent to you that this was -- these documents were provided to the bank by your attorney in this case. And they are several letters to you from Met

life?
A. Yup.
MR. PEZZA: Can we go off the record?
*(Discussion off the record)*
*(Defendant's Exhibits 11 - 15 marked for identification)*
Q. So, could you look, please, at Exhibit 10. And there's -- did you receive this letter from Met life?
A. Yes.
Q. And is it a June -- is it a June 2005 -- June 7, 2005 letter approving your request for disability benefits?
A. Yes.
Q. Did you read the letter when you got it?
A. Yes.
Q. Did you -- you can put that down for now.
Did you discuss your leave -- your plans to go on leave with anyone at work?
A. I e-mailed at the time Anthony DiNovella.
Q. And what did you say in the e-mail?
A. I said that I was having a total knee replacement on both knees, and that I was going to be out approximately 12 weeks.
Q. Do you remember when you sent him the e-mail?
A. Well, it had to be -- it had to be, I guess, beginning

A. I don't know. I don't remember. You know, if I did, I had some pictures or something but I'm not sure.
Q. Did -- what did you do -- did you take things home with you -- anything home with you from the office?
A. I had -- yeah, I had a picture of my granddaughter and my wife and that was basically my personal items.
Q. What type of computer did you have before you went on leave?
A. It was a laptop supplied by BankBank of America.
Q. And did you -- what did you do with that while you were on leave?
A. It stayed at the North Kingstown branch.
Q. So -- and when was your last day of work?
A. I think it was May 27, 2005.
Q. Okay. When was your surgery?
A. May 31. It was Labor Day -- not Labor Day. Memorial Day weekend, so the Tuesday after Memorial Day. So that was the 30th or the 31st.
Q. Okay. Was the surgery successful?
A. Yes.
Q. What's your -- what, if anything, is your prognosis?
A. What is what?
Q. What did the -- what is your prognosis for your knees going forward?

MR. FANNING: Objection.

A. I can't --

MR. FANNING: You can answer if you can.

A. I can't play NFL anymore. No, it's basically, you know, what -- the one thing it accomplished is I don't have the pain. But it's not like having your own knees. You know, I'm limited -- I mean, you know, I'm limited to what I can do as far as if I went to play tennis or.

Q. Do you play tennis?

A. I used to.

Q. When did you play tennis last? When were you last able to play tennis?

A. With my knees, about ten years ago. I used to play a lot of tennis but then just fell apart. Physically.

Q. Did -- did you tell MetLife that you were gonna have both knees done?

A. Well, I did, but when the first form was filled out, it was filled out for what was being done on May 31st and that was my right knee. And they gave me a return date of July -- it's right here. July 31st. Then I had the second knee done and I called them, and I just had -- he went on the same claim number, but we had to send -- the doctor had to send whatever hospital record he fills out when he does it. And he did that and then they extended

A. Do you want me to answer that fully? Yeah, I was supposed to have my left knee done first. Then I changed it at the last minute because I figured after six weeks I could drive with my right and then I'll be incapacitated with my left, so we switched it like the weekend -- well, the day -- the week before, which created all kinds of problems but that's a different issue.

Q. Okay. Did you -- did you notify MetLife of the change?

A. As far as the knee? No.

Q. Okay.

A. I didn't know I had to.

Q. So at some point MetLife contacted you and said that as of July 31, your, your benefits were terminating. Does that -- do you recall that?

A. Yes. I got the letter right here.

Q. And which exhibit is that?

A. That was the first one. Ten. Well, 10 gave me -- told me the period that I was -- my claim was from May 30 to July 31, '05.

Q. Okay.

A. And then on July 10th or 12th, I had my second knee done, and I contacted MetLife and they told me the doctor had to send the hospital report. So then they

extended it until August 31st.
Q. Okay. I believe that's --
A. That's on Exhibit 13. The extension to August 31.
Q. Okay. Now, at the -- there's a series of bullet points on that letter. Do you see those?
MR. FANNING: What letter are you looking at now; 10?
THE WITNESS: Thirteen.
MR. FANNING: Which is 13?
MR. PEZZA: It's the August --
THE WITNESS: I'm sorry, it's --
MR. PEZZA: It's the August 12 letter that starts -- there are a couple of August 12 letters but this is the first August 12 letter with Bates Number 55.
MR. FANNING: Okay, so that would be 13?
MR. PEZZA: That's 13.
MR. FANNING: What's 11 and 12?
MR. PEZZA: The previous two pages.
MR. FANNING: Okay.
MR. PEZZA: I had initially marked these all as one combined exhibit.
MR. FANNING: So Exhibit 11 is the June 7 letter, and 12 is the August 1 letter. Is that right?
MR. PEZZA: That's correct.

MR. FANNING: Okay.

MR. PEZZA: While we're at it, 14 is the second August 12 letter, Bates number 56. And Exhibit 14 is the August 12 letter, Bates number 57.

MR. FANNING: That would be 15, right?

MR. PEZZA: Fifteen.

MR. FANNING: All right, thanks.

MR. PEZZA: No, I apologize for the confusion.

MR. FANNING: So we're looking at 13?

THE WITNESS: Yes.

MR. FANNING: Okay.

Q. Do you see on the bullet points --
A. Mm-hmm.
Q. -- in this letter? Take a minute to review them.
A. I've read them already.
Q. Did you read them when you got this letter?
A. Probably.
Q. Do you remember reading them -- reading the letter?
A. No, but, you know, I obviously read the letter when I got it.
Q. Okay. Do you see where it says there, "A few days before your scheduled return-to-work date, contact your manager and MetLife to confirm the date you'll return to

work"?
A. Yeah, I contacted Caryn Hodges.
Q. Do you remember when you contacted Caryn?
A. Yes, August 29.
Q. August 29. Okay. And down at the bottom, again it says refer to the Associate Handbook for more information about your benefits, and did you refer to the employee handbook after getting this letter?
A. No.
Q. Now, what -- how were you being paid while you were on leave?
A. It was -- I was getting a deposit in my checking account from -- I mean it came through the normal payroll, but on one of the letters it said it was handled through normal payroll but it was disability from MetLife.
Q. Short-term disability?
A. Short-term.
Q. Okay. Was there a waiting period?
A. I think it was seven days.
Q. Okay. And do you remember the amount that you were receiving?
A. No.
Q. Did you have any supplemental disability insurance?
A. No.

Q. Do you remember the percentage of your salary? Or -- well, I guess you didn't have a salary.
A. I think the first -- I don't -- I don't remember the weeks. It went 90, 80 and 70 percent. But I don't know if it was the first two weeks was 90 percent and then it went down to 80, or -- I really don't know the percentages.
Q. Okay. And did you -- were you receiving a draw prior to going on leave?
A. Yes.
Q. And did you continue to receive the draw while you were on leave?
A. No.
Q. If you could take a look at Exhibit 14, the next page. Do you remember getting Exhibit 14?
A. I don't remember but, you got it.
MR. FANNING: The question is do you remember if you got it.
THE WITNESS: Yes. This?
MR. FANNING: I said the question is do you remember if you received it. That's a yes or a no.
A. Do I remember, no.
Q. Okay.
A. But --

MR. FANNING: It's a yes or no.
Q. Did you speak with anyone from MetLife about your extension of leave?
A. You mean from July to August?
Q. Yes.
A. Whoever answered the phone and I gave them the claim number. You go in with your Social, then you give them the claim number. And I said I'm -- "I had my second knee done, what's the procedure?" And she told me what to do. And I contacted my doctor's office and I gave -- I gave my doctor's office the fax number. They said you could fax it, his hospital report, and that's what happened.
Q. Okay. Do you remember MetLife telling you when your Family Medical Leave would expire?
A. No.
Q. Is it fair to say that this August 12th letter, Exhibit 14, states that your Family Medical Leave would expire on August 26, 2005?
A. That's what it says, yes.
Q. Okay. And you don't remember receiving this letter?
A. I -- even if I did -- I mean -- even if I did receive this letter, I don't know what the Family -- I didn't know what the Family Leave Act was at the time.

Q. Okay. Did you understand that you were to return to work -- that you were cleared to be out of work until August 26? Through August 26, 2005?
A. I thought I was cleared to be out of work through August 31st.
Q. So is it fair to say that you didn't understand -- strike that.
Were you aware that there's a -- of a difference between short-term disability payments and medical leave --
A. That there's a difference? No, I was not aware that there's a difference.
Q. Okay. Do you have any reason to think that you did not receive Exhibit 14?
A. No.
Q. Okay. Sir, I believe you said that you called Caryn on -- Caryn Hodges on August 29?
A. That's correct.
Q. Okay. What did you say to Caryn when you called?
A. "I'm ready to come back to work. Do I have -- do I go directly to my office in North Kingstown, or do I have to meet the new manager?"
She said, "You have to meet the new manager."
Q. Okay. And who was that?

A. Excuse me?
Q. Who was that?
A. Lou Garofano.
Q. And did you have anything from your doctor saying that you were ready to come back to work?
A. No.
Q. What's Caryn's -- what's Caryn's title as best you understand?
A. I think she's administrative assistant or, that was the title, I'm not sure.
Q. Is she a member of HR?
A. No.
Q. Did you speak with anybody at HR about coming back?
A. No.
Q. Do you know whether -- one way or the other whether Caryn is trained on the bank's policies with respect to medical leave?
A. No.
Q. On your call with Caryn on the 29th, did you request any kind of accommodation?
A. No.
Q. As of August 29, when you called Caryn after your surgeries, did you need any kind of accommodation to do your job?

A. No.
Q. Did you take any notes of your telephone call with Caryn?
A. Take any notes?
Q. Yeah.
A. No.
Q. What else, if anything, did you discuss on the phone with Caryn?
A. No. So when she told me that I had to meet the new manager, then I said fine. And then she said, "Hold on a second," and she -- she went on his calendar and the first available date was on September 6 that I could meet with him. And then that was changed to the 8th. And then we met on the 8th.
Q. Okay. What -- why did you call -- why did you call Caryn before -- instead of just going back to your office?
A. Well, a couple of reasons. To let her know I was coming back. And to ask the question of whether I had to meet the new manager.
Q. How did you know there was a new manager?
A. Well, I had spoken a couple of times during the summer with Caryn. She called once, there was a question on my office. And then I think I asked her if -- because I

A. Through the end of August, yes.
Q. Do you remember when your last appointment was?
A. Yeah, when I -- when I -- it was supposed to be the last Wednesday in August, and then when I found out on the 29th that I wasn't going to go back until the 6th, I extended it another week, so it was like just before -- just before the 6th. I mean, whatever -- you know.
Q. So, into September?
A. Into September, yeah. I think the Monday, the first Monday or something like that. It can't be the first Monday, that was Labor Day but.
Q. Okay. So, you -- you met with Lou Garofano on the 8th of September?
A. The 8th of September.
Q. And did you meet just with Lou?
A. No, with Caryn Hodges was there.
Q. Okay. And what time of day was this meeting?
A. I think it was 10:00.
Q. Describe the meeting, please.
A. It was brief.
Q. What do you mean by brief?
A. Lasted like ten minutes. And essentially, Mr. Garofano said, you know, "You've been -- you were supposed to report on September 1st, and this is the 8th. You're --

essentially, you were out without permission for a week."

And my answer was I reported when I was told to report.

And then he -- then he asked me if I had gotten a clearance from MetLife, and I didn't remember that I had and I said no, and the meeting was over.

And so I called -- as soon as I got home, I called MetLife. And then around 4, 4:30 the next day on a Friday, Caryn Hodges called me to tell me I needed the physician's note. As a matter of fact when I -- just to back up. When I said to -- when I found out that I had to get a release, I turned to Caryn, I said, "Caryn, why didn't you tell me this?"

She said, "You know, everything's new for me also," because she came over from Quick & Reilly.

And that was it. So I got my doctor's note.

Q. Did you -- did you believe Caryn?
A. Did I what?
Q. Did you believe her?
A. Of course I believed her. There's no reason for her to lie to me.
Q. Okay. So you -- it's your -- it's your testimony that you didn't know that you had to provide anything by way

of doctor's note before --
A. Right.
Q. -- you came back?
A. Right.
Q. Okay. Had you ever heard the phrase "return-to-work certification" before?
A. No. I'd never been out before so, you know, this is all new to me.
Q. Okay. What else -- did you discuss anything else at the meeting?
A. Well, Mr. Garofano told me BankBank of America's mission, that kind of... But it was a very brief meeting.
Q. Okay. But what -- then -- that's fine, but what did he -- how did he describe BankBank of America of America's mission?
A. Well, that their objective was to become the number one investment firm in the world. And that everybody's job was to contribute towards that effort, essentially.
Q. What was your response to that?
A. Nothing, I was just listening.
Q. Okay. Was that different from the way you understood things with Quick & Reilly?
A. Well, it was a whole different structure with

Quick & Reilly. You know, it was two different firms.
Q. Okay. Different approaches to investing?
A. Yeah, different approaches to investing.
Q. Which did you prefer?
A. Well, I really didn't have that much exposure with BankBank of America but they had a more sophisticated platform than Quick & Reilly had. You know, you had -- you had more access to more product than, and that's exactly what you're looking for.
Q. Was Quick & Reilly similar to the Sovereign model?
A. No, no. It was a little more -- believe it or not it was a little more sophisticated than the Sovereign model.
Q. But was it closer to the Sovereign model than to BankBank of America?
A. Yes.
Q. Okay. So we're talking a complete change, completely different --
A. Different firm, yeah. It's a different firm.
Q. Okay. Did you talk about what your production had been before your leave?
A. Nope.
Q. Did you talk at all about expectations, what the expectations were for you coming back?

A. No, the meeting was cut short because I hadn't gotten a release from MetLife.
Q. Okay.
A. Essentially I was told I shouldn't even be there, so that was it.
Q. Okay. Did you discuss where you would be reporting to work?
A. Well, I had found out the day before because I had to check one of my accounts, my checking -- my personal account, and I had found out from one of my branches that my branches had been given away. Reassigned.
Q. Okay. Who did you -- which branch did you talk to?
A. I spoke to Bald Hill.
Q. And who did you talk to at Bald Hill?
A. One of the platform people. Amanda. She's not there anymore but spoke to her and she goes, "Oh, I'm so sorry you're not going to be here."
Q. Do you remember Amanda's last name?
A. No.
Q. And she worked in the platform?
A. Yes.
Q. Like a loan officer or?
A. She was -- you know, not a loan officer. They're not there. You know, they open up checking accounts, CDs,

that kind of stuff.
Q. So, tell me about your conversation with Amanda.
A. No, I called up and, to ask her about something I didn't understand in my checking account, and she says "Oh, you know, they -- " What's her name. "Krista brought in your replacement yesterday to introduce us." And that's how I found out that I was being -- that my branches were reassigned.
Q. And who were they reassigned to?
A. A guy named Stu Latessa.
Q. Okay. L-A-T-E-S-S-A?
A. Very simple Italian name.
Q. I like those. And do you know when Mr. Latessa was assigned to those branches?
A. Stu was brought in from the Massachusetts region.
Q. Do you know when?
A. Yeah, just before I got there -- back. Probably the end of October.
Q. The end of October?
A. No, I'm sorry, August. Sorry.
Q. Do you know for sure when he --
A. The exact date, no.
Q. Why do you think it was the end of August?
A. Because I was friends with Stu so when I came in the

first -- when he saw me walk in to the meeting, the first thing he says to me was, "Joe, I was told you weren't coming back."
Q. Okay.
A. And then he told me that he was reassigned my branches on September 1st.
Q. Okay. Let's take a step back. You talked to Amanda at Bald Hill?
A. Right.
Q. And this was --
A. If I --
Q. What day -- when was this?
A. So it was probably the 7th of September.
Q. Okay. And she says --
A. That she had met with Stu Latessa on the 6th.
Q. Okay. And then when you just -- you just began to describe an interaction with Mr. Latessa. When was that?
A. That was the 8th when I -- I got there early for my 10:00 meeting and it was -- you know, and I bumped into Stu and, you know, we were chatting so.
Q. What did you talk about?
A. Well, essentially it was about the fact that I wasn't coming back, what was I doing there. And then I told

him I found out yesterday through one of my branches that I no longer had the branches. And they had reassigned all the accounts to him and then they took them back because, I don't know why, it probably was they were afraid of getting into this situation. And --

Q. You mean a lawsuit?

A. Yes. And that was it. Then Stu and I -- my computer, my laptop was at Post Road, so Stu and I jumped in my vehicle and we went down to Post Road and I picked up my laptop.

Q. Okay. So you -- so you knew prior to talking with Lou Garofano --

A. Right.

Q. Or you thought that you would no longer be in those branches?

A. Right. And I brought that up and he said, "Well, your accounts had to be covered."

And my reaction was, you know, I left on May 27th, I was coming back on September 8th, and the branches were reassigned on September 1st; how come there was that sense of urgency that they had to be reassigned on the 1st? It was because that appointment on the 6th or the 8th put me in violation of Family Leave Act.

Q. You -- but you don't -- that's your opinion?

A. Excuse me?
Q. That's your opinion?
A. Yeah.
Q. Okay. Did Stu Latessa tell you that it was -- that it was September 1st that he was reassigned?
A. Yes.
Q. And did he say who told him that you were not coming back?
A. No.
Q. Did you ask him?
A. No.
Q. You weren't curious?
A. He just said a broad statement. "I heard you're not -- I heard you weren't coming back." So I didn't say -- I didn't ask him "Who said that to you?"
Q. When did they give you back the accounts that they had given to Mr. Latessa?
A. When did they give them back?
Q. Mm-hmm.
A. Well, they were -- the printout was on a desk when I got there, when I came back -- finally came back to work.
Q. Okay. And I don't think we finished completely with the meeting on September 8. Now, did you speak -- did you talk to Mr. Garofano about where your office space would

be in that meeting?
A. I was shown where it was, yeah.
Q. And where was that?
A. It was isolated from everyone else, across the platform, across the bank platform. Next to -- next to a machine that they use to bind reports. The desk that I had was all full of office supplies. It was the equivalent of the mail room.
Q. Okay.
A. I couldn't bring a client in there.
Q. Okay. Why do you say that?
A. Because it was a total embarrassment.
Q. Did you speak with anybody about the space?
A. No.
Q. Why not?
A. Who was I going to talk to? This was the decision that was made.
Q. You did not ask Mr. Garofano anything about or complain about your space?
A. No.
Q. Okay. The office -- the space at -- are we talking about 111 Westminster Street?
A. Yes.
Q. And that's -- that office space is connected to a bank

branch; is that correct?
A. That's correct.
Q. And is it fair to say that the financial advisors who were assigned to that office space are -- are spread out across the floor?
A. Well, they're in groups. There's one group, and then there's a -- you go around the back and there's another group.
Q. Okay. So everybody isn't all sitting together?
A. Well, they can't sit all together but where they -- where the groups are, they're -- they're -- you know, they're in cubicles but they're, you know, close proximity to each other.
Q. Okay. Why do you say they can't sit all together?
A. Well, because the space doesn't -- you know, you'd need a big square room with, you know.
Q. Is it tight quarters over there?
A. No, I don't think it's tight but, you know, it's just that each section isn't big enough to house all the reps in one place.
Q. Were there other spaces, other cubes that were open?
A. I don't know, to be honest with you.
Q. Okay. You talked to -- did you talk about training on the new bank, this new BankBank of America model? Did

you talk about that at all in this September 8 meeting?
A. Well, I was told that, you know, until I learned the system, you know, I was to stay here. I had been trained on the system. But then it, you know, it's very difficult to get on the system -- to train on the system when you weren't there, and I was the only person in the entire group that didn't have a sales assistant or didn't share a sales assistant, so I really had no one to turn to.
Q. Okay.
A. Actually Stu Latessa helped me out in the beginning.
Q. Okay. Before -- before we get to -- before we get to that, let's just focus on did you discuss your need or desire for training in that September 8th meeting; say, "Hey, I need to get back up to speed?" Did you talk -- did you say that, talk about that at all?
A. No.
Q. Okay. But the -- the reason -- was there -- but the reason for you to come to the Providence office -- this work in the Providence office is so you could help get back up to speed; was that the rationale that was given to you?
A. Yes.
Q. Okay. Did that make sense to you?

A. No.
Q. Okay. Why not?
A. Why not? Because I was being penalized for taking the medical leave. My branches were taken away from me. If I needed help, there are 800 numbers, you can call up tech support and everything else. I could have got -- and this is -- the same thing I had to do in Providence, I could have done it in North Kingstown and I could have done it in Bald Hill. So, you know, that's it.
Q. Okay. Did Mr. Garofano say anything about your age?
A. No.
Q. Did Caryn say anything about your age at the meeting?
A. She used to call me Uncle Joe. I don't know why. We're not related and she always addressed me as Uncle Joe, so I think that's, you know, a direct reflection on my age.
Q. Okay. Are you claiming that Caryn Hodges discriminated against you?
A. I'm not saying it was discrimination but I still don't understand why I was called Uncle Joe.
Q. Okay. Did you ever -- did that make you uncomfortable?
A. Well, you know, it's -- you know, I'm usually the oldest person in the room so, you know, I really don't need someone calling me Uncle Joe.
Q. Did you ever tell her that?

A. Absolutely.
Q. And what was the reason that you --
A. Well, I -- you know, I felt that Mr. Garofano thought I was some kind of a dinosaur. And also, I was coming off a 12-week medical leave, so now besides being old, I'm disabled. And I feel that all played a part in why we're here today.
Q. Do you know whether Mr. Garofano knew why you were out on a leave?
A. No.
Q. Did you ever discuss your leave with him?
A. The meeting took ten minutes.
Q. Okay.
A. And then I was -- I was dismissed because I didn't have my release. And that was the only meeting I ever had.
Q. Okay. So if he didn't talk about your knees, just the fact that you had been on a medical leave?
A. That's correct.
Q. Okay.
A. Actually, no. I think I came back -- now, let me backtrack on an answer. I don't remember if there was a second meeting.
Q. Okay.
A. Let me just clarify that.

Q. Okay. Well, I have a couple other questions and then we'll come back and we'll see if we can't figure out whether there was one.

Do you remember anything else from that ten-minute September 8 meeting?

A. No.

Q. Okay. So what did you do after -- well, you -- after you left the meeting you went with Mr. Latessa?

A. No, not that day. I went -- that was the 8th.

Q. Yes, I'm -- let's talk about the 8th. What did you do after you got out of the meeting?

A. I went home and I called -- I got my records and I called up MetLife and told them I was ready to go back to work. Then the next day on Friday, around 4:30, I got a phone call from Caryn Hodges saying that I needed a doctor's note. The doctor's office was closed, I got a hold of them on Monday, I got the note around Wednesday.

Q. Did you talk to someone at MetLife or did you leave a message?

A. No, I believe I spoke to someone. I don't know. I don't know if that was automated or I spoke to her. I don't remember.

Q. Okay. But you didn't -- you didn't know any -- you

didn't call -- they didn't -- whichever way, if you spoke to somebody, or MetLife did not tell you to call your doctor; is that true?
A. No.
Q. Okay. So the first time you heard that you needed a doctor's note was 4:30 on Friday?
A. Right.
Q. When Caryn called you to let you know?
A. That's correct.
Q. Okay. How did you know your doctor's office was closed?
A. Because I called them. I called to tell the, you know, receptionist that I needed a back-to-work note. And I got a recording. I guess on Fridays they close at 3 or 4, something like that. So I called Monday.
Q. Okay. And is this Monday the 12th?
A. Yes.
Q. And what happened when you called?
A. I told her I needed a note saying that I was fit to go back to work. And she said she would have Dr. Cote --
Q. Okay, so who did you talk to at the doctor's office?
A. The receptionist. The one who answers the phone.
Q. Did you ever speak with Dr. Cote?
A. No.
Q. Did the receptionist ask you how you felt?