# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOSEPH VASTA | : | |
| | : | |
| vs. | : | C.A. NO. 06-396-T |
| | : | |
| BANC OF AMERICA INVESTMENT SERVICES, INC. | : | |
| | : | |

**CONTINUED DEPOSITION OF JOSEPH VASTA**

Monday, July 16, 2007

10:00 a.m.

EDWARDS ANGELL PALMER & DODGE, LLP

2800 Financial Plaza

Providence, Rhode Island 02903

\- - -

Lori P. Hamel, RPR, CRR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886

Q. And does he practice with Dr. Cote?
A. They're in the same facility but they're not partners. Cote -- I think Cote rents from him, office space.
Q. And what's Dr. Wiggins first name?
A. Unfortunately I call him doctor.
Q. Okay. I'll just take this opportunity to remind you that if you don't know the answer, we'll need for the purposes of the transcript to have just a I don't know or a yes or a no.
A. Okay.
Q. So just verbal responses.
A. I don't know his first name.
Q. Okay, thank you. And when was the last time you saw Dr. Wiggins?
A. I just went for a follow-up, I think it was around March. And I'm through with him as far as, you know, having to go back.
Q. And what was the nature of your treatment with Dr. Wiggins?
A. I had the rotator -- I got the rotator surgery.
Q. Your rotator cuff?
A. Yeah.
Q. On your right shoulder?
A. Yes.

Q. And when was that surgery?
A. That was March of '04 -- '05, '05.
Q. And how many times since then have you see Dr. Wiggins?
A. Approximately four times.
Q. And that surgery was a success, right?
A. Yes.
Q. Other than Dr. Cote, Yerneni, Koor, Bogue and Wiggins --
A. Okay.
Q. -- have you seen any physicians or medical providers since January 1, 2005?
A. No.

MR. PEZZA: So, Mr. Fanning, it appears as if the scope of our request would be for medical records from those -- the Drs. Yerneni, Koor, Bogue, Wiggins and Cote, from January 1, 19 -- 2005 to the present.

MR. FANNING: Yes.

Q. What type of -- what type of doctor is Dr. Wiggins?
A. Orthopedic surgeon. He specializes in shoulders.
Q. And you don't expect to have any more follow-up visits with Dr. Wiggins?
A. No.
Q. Mr. Vasta, I'm going to show you what's previously been marked as Exhibit 13.
A. Okay.

Q. Do you remember reviewing that document at the -- your first day of your deposition?
A. Yes, I do.
MR. FANNING: If I may, just one second.
*(Counsel perusing document)*
Q. Okay. Now, prior to your return -- strike that.
Before you called Caryn Hodges on August 29, 2005, did you call MetLife?
A. No.
Q. And you didn't call MetLife before you went in to meet with Mr. Garofano; is that correct?
A. I did not.
Q. So, if you recall, we talked in your -- the first day of your deposition about the meeting you had with Caryn Hodges and Mr. Garofano --
A. Yes.
Q. -- on September 8, 2005?
A. Yeah.
Q. And after that meeting, you contacted MetLife to tell them that you had returned to work; is that correct?
A. That's correct.
Q. And after that meeting, you contacted your doctor in order to obtain a return to work certification; is that right?

A. That's correct.
Q. And when did you -- and you received your return to work certification on what date?
A. It was like the -- I think the Tuesday or Wednesday of the following week.
Q. So would that have been --
A. If -- you know, the 8th was on a Thursday, and Ms. Hodges called me Friday late, so I -- the office was closed, you know. So I called Monday. So, one day that week I got it.
Q. Okay. So you called -- you called in the following week, and isn't it true that your doctor provided some form of a return to work notice for you; that's right, isn't it?
A. Said that I was fit to go back to work, yes.
Q. Yes. And your doctor -- this is Dr. Cote?
A. Yes.
Q. And Dr. Cote didn't clear you to return to work until the 19th of September; is that right?
A. That was not supposed to be the 19th. Yeah, the letter said the 19th.
Q. Well, but he didn't clear it -- he did not clear you to return until the 19th; that's right?
A. That's correct.

MR. FANNING: Objection, but you can answer if you want.
A. No -- yes or no, I don't know.
MR. FANNING: Wait, wait, stop, stop. Give me a minute to object before you answer if I object. Objection on that question. If you can answer it, go ahead.
MR. PEZZA: I think the witness has already answered the question.
THE WITNESS: What was my answer?
MR. PEZZA: Could you please read back the last question and answer.
*(The record was read by the court reporter, as requested)*
MR. FANNING: Off the record for one second.
*(Off the record)*
BY MR. PEZZA:
Q. So we're back on the record.
So, Mr. Vasta, when did Dr. Cote clear you to return to work?
A. If we go by the letter, it was the 19th of September.
Q. So --
A. And that -- yeah, the 19th.
Q. Do you have any --

MR. PEZZA: Can you mark that, please.

*(Defendant's Exhibit 16 marked for identification)*

Q. Mr. Vasta, I'm handing you what's been marked as Exhibit 16.
A. Okay.
Q. Take a second to look at that.

*(Witness perusing document)*

A. Yup.
Q. Now, this is the return to work certification that Dr. Cote provided for you; isn't that right?
A. Yup.
Q. And Dr. Cote stated on this that -- or in this -- strike that.

And this return to work certification states that you can return to work on the 19th of September; is that right?
A. Mm-hmm.

MS. KOKODIS: I'm sorry, is that a yes or a no?

A. Yes.
Q. And you didn't have any restrictions placed on you as far as your -- any work restrictions placed on you by Dr. Cote, did you?

A. None.
Q. Dr. Cote didn't -- didn't require that you have any accommodations to return to your job, right?
A. No.
Q. And did you -- when you returned to work -- or you were cleared -- strike that.
You were cleared to return to work full-time?
A. Yes.
Q. Correct? When was the last time you met with Dr. Cote prior to your return to work?
A. I don't know. Probably sometime in August, I'm not sure. But he -- you have his report, so. You have it right in front of you.
Q. Could it have been September 7, 2005?
A. If you -- you have the date there so, if it says September 7, that's when it was.
Q. Okay. So, did you meet with Dr. Cote on September 7, 2005?
A. If it says it on that piece of paper, which is his record, the answer is yes. But you have the paper, I don't.
Q. The last time you met with Dr. Cote, did he tell you anything about how your -- how you were progressing following your surgery?

A. Yes. Everything was fine, you know. And that's it. I asked him what restrictions I had, and I didn't have any -- well, I couldn't do squats with weights on my shoulders. I didn't do them when I was 20, so I wanted to do them now. But other than that I had no restrictions.
Q. Okay. And did you have any follow-up visits with Dr. Cote?
A. Yes, I think I had one -- may have been December of that year, I'm not sure. I know I had one last December in '06, it was just a routine follow-up. And then I don't have to see him until next year.
Q. The time -- when you met with Dr. Cote in September of '05, the next time -- the next time you met with him following that was December of 2005?
A. I think so, but you have the record for all of '05 so, you know. I don't remember.
Q. It's your recollection it was several months later?
A. I believe so.
Q. And did you provide this return to work certification to Bank of America?
A. Yes. I faxed it.
Q. Who did you fax it to?
A. Caryn Hodges.

Q. And you didn't talk to Caryn about the return to work certification, correct?
A. What do you mean? This letter?
Q. Yes.
A. Yeah, I -- I called her to tell her I was faxing it, and that was it.
Q. Okay, thank you. Mr. Vasta, I'd like to talk about September 19, 2005. That was the day that you returned to work. Correct?
A. Yup.
Q. Okay. I want to talk about what your -- what your daily routine was for that day. So, prior to returning to work, what was the first thing you did that day?
A. Well, I was shown where my desk was gonna be.
Q. I don't mean to interrupt. What was the first thing you did when you woke up that day?
MR. FANNING: Objection.
A. I would give you the real answer but I'm not. No.
MR. FANNING: Objection.
A. All right.
Q. Did you get ready for work that day?
A. Yeah, I showered, shaved, I put on a suit and tie and went to work.
Q. Did you have any trouble accomplishing those tasks?

A. No.
Q. Did you need any assistance?
A. No.
Q. Now, which office did you report to on the 19th?
A. Providence.
Q. 111 Westminster Street?
A. Yes.
Q. And how did you get there?
A. Drove.
Q. You drove yourself?
A. Yes.
Q. How long a drive is that?
A. From Barrington it could be anywhere from 15 minutes to a half hour, depending on the traffic.
Q. And did you have any trouble driving that day?
A. No.
Q. Do you remember what time you arrived in Providence?
A. Probably was around 8:30, twenty of 9.
Q. Where did you park?
A. I found a -- I still had a handicapped sticker and I found handicapped parking in -- around Kennedy Plaza.
Q. How far a walk was it from --
A. Just -- I'm sorry.
Q. How far a walk was it from your car to the office?

A. I just had to walk through the park.
Q. About how long did that take?
A. Ten minutes. You know.
Q. Did you have any trouble walking?
A. No.
Q. Did you use any walking aids?
A. No.
Q. Were you carrying anything with you?
A. Probably a briefcase, I'm not sure.
Q. And which entrance did you use to get into 111 Westminster?
A. Well, I had to go in the lobby part of it because of the front doors weren't opened yet.
Q. And did you have to go up any stairs?
A. Yes, about three or four stairs.
Q. Any trouble going up the stairs?
A. No.
Q. When you came back on the 19th, did you need any accommodations to perform the duties of your job?
MR. FANNING: Objection. Go ahead.
A. You mean physical accommodations or?
Q. Accommodations of any kind.
A. No.
Q. Did you request any?

A. No.
Q. Have you ever requested accommodations from any employer?
A. No.
Q. Once you got to work on the 19th, what was the first thing you did?
A. I went in to Caryn's office.
Q. You mean Caryn Hodges?
A. Caryn Hodges' office.
Q. What did you do in Caryn's office?
A. I asked her where my desk was.
Q. What did Caryn say?
A. She walked me to the -- where I was gonna be -- where my desk was. And I asked about my laptop, and my laptop was still in my former office in North Kingstown.
Q. What else did you talk about with Caryn?
A. That's about it.
Q. Did you talk about your knee?
A. No.
Q. What was the -- what was the next thing you did after Caryn showed you your desk?
A. I met with the guy who I knew anyway was replacing me in my branches, and we both got in his vehicle and we went down to North Kingstown so I could pick up my laptop.

which I was trained on anyway, then we'll talk about it, so.
Q. Did you talk about your knee?
A. No.
Q. Did you talk about any impairments that you may have had?
A. No.
Q. Did you talk about your -- you didn't talk about your age?
A. No.
Q. Now, at the time you came back to work from your leave, you were able to perform all of the essential functions of your job; is that correct?
A. Mm-hmm, yes.
Q. And your knees didn't affect your ability to do the job for the bank?
A. No.
Q. Did your shoulder affect your ability to do your job for the bank?
A. No.
Q. Did anything else affect your ability to do the job for Bank of America?
A. No.
Q. And how did -- as of the day you returned to work, how

did your knees affect your daily activities?
A. They did not.
Q. Now, Mr. Vasta, why do you believe that you lost your branches?
A. Why do I believe I lost my branches? Well, I -- I was out.
Q. You were out. You mean --
A. On medical leave. Okay? And they got new management in, and I was one of the guys that he -- I was one of three guys that he wanted out, and so he made it impossible for me to successfully return to work.
Q. So, my -- okay. Why do you believe that you lost the three branches?
A. Why do I believe?
Q. Yes.
A. I have no idea.
Q. Do you have a belief as to why you lost the branches?
A. Because he was restructuring, I have no idea. He can't base it on my production, I wasn't there.
Q. You said you were one of --
A. Three people, yes.
Q. One of three people. And who were the other two people?
A. I was told this by one of the people that -- okay.
Q. Mr. Vasta, I don't mean to interrupt but could you

please, who were the other two people?
A. Chuck Martin and Jason Lofgren or Logren or something, I'm not sure about his last name. And me.
Q. Okay. And what -- and were -- these were two financial advisors?
A. Yes.
Q. And they were based out of the Providence office?
A. Yes. And according to Chuck Martin, Lou Garofano told Chuck that he wanted Chuck out, Jason, and me. And that's how I was greeted day two in Providence.
Q. So Chuck Martin told you --
A. That Lou Garofano told him that he wanted Chuck out, Jason out, and me.
Q. Okay. And what do you mean by wanted out?
A. Out of his department. Out of his -- out of his group.
Q. And how old is Chuck Martin?
A. He's probably early thirties. Late twenties, early thirties.
Q. How old is Jason Loughlin[sic]?
A. He's in his mid thirties.
Q. Did Chuck say why -- or do you know why -- strike that. Did Chuck say why Garofano wanted the three of you out?
A. He basically -- when it came to Chuck himself, he said that Garofano said that he didn't think he had the

ability to close big deals. As far as Jason and myself, no, he didn't say anything.
Q. Okay. Do you know whether Chuck Martin ever took a medical leave?
A. No, I wouldn't know.
Q. And you don't know whether Jason Loughlin ever took a medical leave?
A. No.
Q. Did either of them -- do you know whether either of them suffered from any kind of impairment?
A. No.
Q. Is Chuck Martin still with Bank of America?
A. Different division, not -- yeah, he's with private banking, I think, now.
Q. Okay. Is Jason Loughlin still with Bank of America?
A. I have no idea.
Q. Did you ever talk to -- did Mr. Garofano ever tell you that he wanted you out?
A. No.
Q. Now, what else did you talk with -- talk about with Mr. Garofano on that first day that you came back to work?
A. That was basically it. That he told me what Lou Garofano had told him.

Q. Okay, new platform. And you needed refresher training to get up to speed on this, correct?
A. I went to all the training. Even the week before I went on medical leave, there was a two-day thing in Boston that I went to. The month before that, that was probably in April, there was a two-day hands-on training in Connecticut that I went to. So whatever training was out there up until May 30, I had gone through.
Q. Okay. And did you -- did you remember all of that when you came back on September 19?
MR. FANNING: Objection.
A. All of it, no, but --
THE WITNESS: Did you object?
MR. FANNING: I did.
THE WITNESS: Okay, I'm sorry.
MR. FANNING: You may answer, go ahead.
A. All of it, no, but most of it, and then it was starting to come back so, you know. I mean, I could have been up to speed -- if I had someone with me, like an assistant, I could have been fully up to speed in a day or two.
Q. Okay. But you didn't ask for an assistant?
A. I didn't ask, I wasn't given one. Everybody else had one.
Q. But you -- did you ever -- you never asked for it --

back, the last question, please.

*(The record was read by the court reporter, as requested)*

A. But. Should I continue from the but?
Q. Is there more to answer to that question?
A. Yeah.
Q. Okay.
A. A list went out, every salesman's name was on there and with their assistant that they share -- most of them shared assistants, no one had their own. You know, most of them had a share. And every name was on but mine.
Q. What was the date of this list when --
A. I saw it the week I came back so, the specific date, I have no idea.
Q. And did you ever ask any -- did you ever ask anybody why your name wasn't on the list?
A. No.
Q. Do you have a copy of that list?
A. No.
Q. Did you ever have a copy of the list?
A. Yes. When it came out, yeah, on my desk.
Q. Okay. What happened to the copy?
A. You know, it's at -- I had a desk in Providence, I don't know what happened to it. I don't know what happened

with anything on that desk.
Q. Okay. So -- now, did you have a sales assistant before you went on leave?
A. No.
Q. Other than this list that you just described, do you have any other information about sales assistants who were assigned to -- who may have been assigned to other financial advisors?
A. No.
Q. Did you ever ask Caryn for any help?
A. Yeah, she was -- yeah, I would call her and, if I needed to know where to go, she would give me, you know, an 800 number, or if I needed some tech support or whatever I needed, you know.
Q. Was there any help -- strike that.
Did you ever go to a woman named Katie Armstrong and ask her assistance?
A. I don't know who she is.
Q. Do you know whether sales assistants were assigned to financial advisors based on their production?
A. I don't know.
Q. Do you know what the criteria was for assigning sales assistants to financial assistants?
A. No --

A. Denied me any what?
Q. Any tools that you would need to perform your job.
A. Yes.
Q. And what were those?
A. Well, they denied me access to a customer base in the -- as far as the branches were concerned. My accounts were reassigned, then reassigned back to me but there were a lot of accounts that were not in that second reassignment. Zero support. I mean, you know, it's -- I've been in the business 39 years, I don't need to be told when someone wants you out. And the only thing they didn't tell me was leave at that point.
Q. What support did you feel that you needed in order to perform your job that you weren't getting?
A. I needed a sales assistant. I didn't -- if I took in a check, I didn't even know what to do with it under the new system. You know. And I had to walk around and ask one of the other brokers for a favor. You know, what do I do with this. You know, you just-- you know, you just can't walk into a void, and that's what I did.
Q. So would you often ask your other brokers how to take care of things?
A. Yes.
Q. And how often would you do that?

A. As I needed to know something, I would ask someone. You know, I -- I don't know how often.
Q. Was there ever a time that you needed some information that you were unable to get it?
A. Um, if no one was around, yes.
Q. Can you recall an instance when that happened?
A. No.
Q. After you came back from leave, from your medical leave, did you undergo any training on the new Bank of America systems?
A. No.
Q. Did you attend any seminars?
A. There weren't any. I attended a couple of sales meetings.
Q. And where were these sales meetings?
A. Usually downtown, 111 or one of these buildings.
Q. Do you remember -- do you recall how many you attended?
A. Well, I came back in September. September we had, I believe, our annual compliance meeting, which is mandatory there. You know, you have to do for your licenses. And then I went to a couple of the sales meetings. I think there was one for October, one for November.
Q. Did you -- did you do any computer-based training after

you came back?
A. No.
Q. Do you know whether there were any computer-based training modules available?
A. No, I did not.
Q. Did you feel like you were up to speed on the Bank of America system at the time you came back?
A. Not a hundred percent, but enough to function.
Q. Was there a time that you felt that you were a hundred percent up to speed?
A. No.
Q. Did you ask anyone for assistance in getting a better understanding of the Bank of America system?
A. Essentially there was no one to ask, okay. I got -- was on that isolated island, there was no one to ask. I would get favors from -- I would ask Stu Latessa, because we worked at a different firm previously, and Stu would help me out if I needed some help. But I essentially had no help.
Q. You testified that you would call Caryn and she would provide phone numbers or answers?
A. Right.
Q. Is that -- that's right?
A. Right, if I -- yeah.

Q. So, you never went to Caryn to ask how you could better get up to speed on the Bank of America systems?
A. I did not. Caryn -- Caryn is running the whole area so, you know, she doesn't need me or somebody else going in there asking her to do mundane stuff.
Q. Did you -- did you attend Mr. Garofano's Perspectives on Planning?
A. Yes, I did.
Q. What -- well, what was -- was that a seminar of some kind?
A. Well, I -- um, there was a meeting on that, but I went -- I went to their two-day -- and this was before Mr. Garofano. I went to a two-day hands-on in Connecticut, and Perspectives on Planning was part of that curriculum.
Q. Okay, how about after your leave, did you go to anything -- any seminars on Perspectives on Planning?
A. No.
Q. Do you know what the IRIS, I-R-I-S, system is?
A. I believe it's an information system where you put customer information. I'm not a hundred percent sure. It's like a year and a half now.
Q. Okay. Did you ever use this system?
A. Probably not.

Q. Do you have any understanding as to whether it was required or not for you to use the system?
A. No, I don't -- I don't know if it was required.
Q. Did you ever take any training on the IRIS system?
A. Yes.
Q. Did you ask anybody any questions about the IRIS system after you came back from leave?
A. No.
Q. Let's talk about your work schedule after you returned from leave. So, let's start with the first week. The first week you came back on the 19th and reported to Providence; is that correct?
A. That's correct.
Q. And how many days did you work that week?
A. The whole week.
Q. So, five days?
A. Five days.
Q. And what were your hours?
A. I used to get in before 9 because I wanted to get that parking space, the handicapped space. And then I probably left 4, 4:30, something like that.
Q. So it's your testimony that during that first week, you worked every day from 9 to 4:30 or 9 to 4 or 4:30?
A. Yeah, like 8:30 to 4:30, something like that.

Q. So is it your testimony that starting in October of 2005, you began working from home?
A. No.
Q. For a portion of the week?
A. A portion, yes.
Q. Okay.
A. Probably it was mid October. Probably was mid October. Not like from October 1, or whatever, you know.
Q. Okay. And did you tell anyone that you were working from home?
A. No.
Q. Did you ask anybody for permission to work at home on those days?
A. No.
Q. Did you call in to the office to report where you were on that -- on that -- any given day?
A. No. But I didn't have to. It's not a question of -- we don't punch a clock.
Q. Okay. Are you aware of any other brokers who worked from home?
A. No.
Q. How did you access the bank's computer systems from home?
A. I didn't.

Q. Can you describe -- describe, please, how you -- strike that.
What was it -- could you describe a typical day in -- when you worked completely from home? What were you doing during that time?
A. I was calling accounts that were assigned to me. Trying to develop -- trying to develop business, trying to make appointments.
Now, another thing with the re -- with the accounts that were assigned to me; I mean, these accounts were either out of North Kingstown or Warwick. And try to get a Rhode Islander to leave their town to go into the next town, it doesn't happen. And nobody was coming to Providence. That was very difficult.
Q. So other than calling to set up meetings, did you do anything else at home? Did you do any other work at home?
A. Well, I -- I did -- I was trying to develop business, that's what I was doing. And then if I set up an appointment, or I had a couple of existing accounts, I would make appointments and go from the house to the appointment.
Q. Did you do any other work from home other than placing phone calls?

A. No.
Q. And how many appointments did you set up after you came back from medical leave?
A. I have no idea.
Q. Can you estimate how many?
A. No.
Q. What percentage of your time after medical leave was spent at appointments with customers?
A. It's hard to say. I was trying to set up the appointments. I have no idea, you know. It's hard to say.
Q. Did you have access to your customer files when you were at home?
A. Not at home.
Q. So you've testified about your client list that your -- the list of clients that you had upon return from leave. Was that the same -- that was -- was that the same client list that you had before you went on leave?
A. Some of it, yeah.
Q. Okay. Well, what was -- what was not the -- what was not the same about it?
A. No, there were some -- a couple of real big clients of mine that no longer were on my list.
Q. And --

Q. Did you ever ask to get a copy -- to get your calendar back --
A. I did not.
Q. -- from the office? Did you keep track of any Bank of America information on your home computer?
A. No.
Q. How many sales transactions did you make after you returned from leave?
A. Not many. Not many. I don't know, maybe eight or ten.
Q. Do you recall what clients these were for?
A. Yup.
Q. Which clients were those?
A. Horacio Welding. The -- Dr. Eastman's simple IRA's.
Q. Is he the dentist?
A. Mm-hmm. Tony's Seafood. I've had -- I had more than one transaction for these people. And I transferred over some accounts for Horacio; his wife's account and he had some other accounts.
Q. And this is after you returned from leave?
A. After I returned, yup.
Q. Now, I believe you testified in the first day of your deposition that these were three of the clients that you brought with you from IFMG; is that correct?
A. That's correct.

Q. Oh, and do you -- did you speak with Don Anderson that week, the week before you were separated?
A. I don't know.
Q. Okay. Where was your -- where was your laptop computer that week?
A. Downtown.
Q. In the Providence office?
A. Yes.
Q. And you left that at your desk at your work space?
A. Yes.
Q. Was it in your desk?
A. No, it's just a thing that it goes on.
Q. So it's on top of your desk?
A. Right.
Q. Okay. And so how specifically were you notified of your separation from employment?
A. I had gotten a voicemail from Caryn Hodges, and either -- I think it was either call her or call Lou Garofano. So I called up Caryn Hodges and she transferred me to Lou Garofano. And I think his line was busy or something and he called me back on my cell.
Q. He called you on your cell?
A. Mm-hmm.
Q. And where were you -- you said you were leaving a

client, but where were you?
A. In Seekonk.
Q. In Seekonk. And were you at the client?
A. I was just walking out --
Q. Okay.
A. -- of the client's -- you know. With them you have to go really early or else, once they start getting busy you can't talk to them.
Q. So what time of day was this?
A. Well, the call came in about ten, but I got to -- I got to the client about eight-thirty. Eight-fifteen, eight-thirty.
Q. So the call where you spoke with Mr. Garofano was ten o'clock?
A. I think. You know.
Q. Okay.
A. It was in the morning.
Q. And could you describe this conversation for me?
A. Yeah, he basically asked me if I was feeling okay and --
Q. May I interrupt. He basically asked you or, what do you recall him saying?
A. He asked me if I was feeling okay. I said I'm feeling a hundred percent. Then he -- after that he said, "You're terminated." I don't remember the full conversation.

Q. Did he give you a reason why you were terminated?
A. The reason -- the real reason? No.
Q. Did he tell you that you were being separated for job abandonment?
A. Oh, yeah, no, that came up later on. Not at that phone call. It wasn't job abandonment; that came up at a hearing that we had.
Q. Okay. So did he give you a reason on the telephone call?
A. He said, "I haven't seen you in the office," or something like that, and what have I been doing.
I said, "I've been working out of my house."
He says, "Well, we don't work that way." He says, "Are you -- how are you feeling?"
I said, "A hundred percent."
He said, "Fine, then you're terminated."
Q. Okay. The order -- if I could, what was the first thing he said to you?
A. Hello.
Q. Hello. Well -- and what was the next thing he said after hello?
A. I really don't know. I think he asked me where I was. I told him I was leaving a client meeting. I'm not sure.

Q. And then he asked you where you had been?
A. Yeah.
Q. And you said you'd been working from home?
A. That's correct.
Q. And then he asked you how are you feeling?
A. My state of health, yeah.
Q. Do you remember the words he used?
A. No. But it was like, how do you feel? Are you having -- do you have a medical problem? Something like that. And I said no, I'm a hundred percent.
Q. Okay. What was the next thing that was said between the two of you?
A. He said, "You're terminated."
Q. What did you say?
A. "Thank you." And I hung up on him.
Q. Okay. Did -- so Mr. Garofano didn't mention anything about your age in this conversation?
A. It's all about my age. It's about my age. I came back as a 63-year-old after medical leave, which made me now handicapped. This -- this -- all this is bullshit. It's all about my age and my surgeries. So, we want to get to the bottom line, we got to the bottom line. Now did he specifically say age? No. But it's all about that.

Q. And Mr. Garofano called you, asked you where you were; he asked you -- and you responded that you had been -- you were at a client. You stated that you had been working from home. He asked you whether you were -- whether there was any -- you had any medical problem; you said no. He said you're terminated, and that's all you recall from the conversation?
A. That's correct.
MR. FANNING: Objection.
Q. Did I -- is there anything that I left out from that characterization?
A. I don't think so. I don't know.
Q. And it's fair to say that before your separation from employment, Mr. Garofano never made any comments to you about your age?
MR. FANNING: Objection.
A. No.
Q. No, he never made any comments?
A. No, he never made a comment about my age, no.
Q. Okay. And he never made any comments about whether or not you had a disability?
A. Right, that's correct.
Q. When was the last time you actually saw Mr. Garofano prior to your separation?

"Well, I knew why he was doing it. He was doing it because I was, uh, because I didn't have an account base. I was not generating."

Did I read that correctly?

A. Mmm.

Q. Is that the reason why you believe Mr. Garofano terminated you?

A. Partially.

Q. Did you say -- well, what are -- what is another reason why? What are the other reasons why?

A. The reason was obvious. I mean, he took away my branches. He had a preconceived decision in his mind, A, that I wasn't doing -- no, not because I wasn't doing business and I couldn't do business. My -- my age and the fact that I was disabled.

Q. Was there anything else?

A. No, I don't -- I don't know. I don't think so.

Q. Okay.

A. I'm not sure.

Q. So, the first thing you said there was that you weren't doing business?

A. That's correct.

Q. Is that accurate to say?

A. Right.

or a bond, I -- you know, how do you execute it. This was all a whole new platform. I knew how to do it at Quick & Reilly, I did not -- and this is the type of stuff you need to do business.
Q. Okay. So these are the Bank of America procedures that you're referring to; how you get things done at -- under the Bank of America --
A. That's correct.
Q. -- model?
A. Right.
Q. Okay. And was there anyone else that you could have talked to other than a sales assistant?
A. Yeah, I could have talked -- I did. I mean, I knew Stu Latessa. I knew Chuck Martin. And if I had some questions, I would ask them, you know, if they had the time. But they had their own business to worry about.
Q. Were there any questions that you had -- were there any questions that you had that you didn't ask to one of your co-workers?
A. I don't know.
Q. Now, Stu Latessa is the person you claim was -- that replaced you; is that right?
A. Yes.
Q. And how old is Mr. Latessa?

A. At the time he was 49.
Q. How many years younger than you is that -- was that at the time?
A. I was 63, so that's 14 years.
Q. Do you know what his -- how long he had been at the bank?
A. He went at least a year before I went there, but he was -- he was working out of New Bedford. And then the last week in August, or just before I was to come back, they brought him from New Bedford to Providence.
Q. Do you know why they did that?
A. To -- obviously to replace my -- me. Because he was -- when I saw him the first day, on September 19, he said to me, "What are you doing here? I thought -- they told me you weren't coming back."
Q. But my -- do you know why he was -- why he was taken out of New Bedford?
A. No, he wanted out of New Bedford because they were -- it was a different -- the model that Bank of America wanted to use now did not fit the clientele in New Bedford. You know, and -- I mean, in New Bedford if you asked somebody, you know, where did -- this hundred thousand you want to invest, you know, where did you get it from; and they'll tell you none of your F'n business. You saw

A. Obviously.
Q. In what way?
A. In what way? He was given my branches, he had a sales assistant. I mean, he had a desk in an area where there -- all the other brokers were instead of being isolated across the platform. You know, it was so obvious. You know, it's like you walking in here tomorrow and your office is now in the mail room. They don't have to tell you you're on your way out.
Q. Did you -- did you complain to anybody that you were being treated differently because of your age?
A. I'm not a whiner. No.
Q. So you didn't call HR?
A. No. I would never do that.
Q. Did you ever tell anyone that you were going to file a charge of age discrimination?
A. No.
Q. Did you ever threaten -- tell anybody you were going to file a lawsuit?
A. No. I was terminated in November, and I didn't make the decision to even inquire about a lawsuit until sometime in late February, so it was not on the top of my mind.
Q. Okay. Do you know Ron Nobrega?
A. Of course. I trained him in 1986. He learned the

municipal bond business from me.
Q. What -- what employer was that with?
A. Well, Industrial National Bank which became Fleet which became Bank of America.
Q. Okay.
A. I headed up the municipal bond department.
Q. And how old is he?
A. Ronny's gonna -- probably he's pushing 70. He's about 69 now. Or maybe he is 70 already.
Q. So a little bit older than you?
A. Yeah.
Q. And did he report to Lou Garofano while you were reporting to Lou Garofano?
A. Yes.
Q. As a financial advisor?
A. Not really. He's in the high net worth. I mean, Ronny -- Ronny's not licensed to do prospectives in planning. I mean, he's got his own little niche that he's been doing since 1976 and, you know, he's there for 33 years and he does his own thing.
Q. Did Lou Garofano want to get rid of him?
A. I have no idea, you gotta ask Lou Garofano.
Q. Well, but you said that Lou Garofano wanted to get rid of you, Mr. Martin, and Mr. Loughlin though.

A. Right.
Q. Okay. How did -- but not -- you never heard that he wanted to get rid of Mr. Nobrega?
A. No.
Q. Okay. And Mr. Martin and Mr. Loughlin were younger than you were?
A. Yes.
Q. They were in their thirties?
A. Yes.
Q. Do you believe that Mr. Garofano wanted to get rid of them because of their age?
A. I have no idea why he wanted to get rid of them. I only know why he wanted to get rid of me.
Q. And -- okay. Is there anyone else that you claim was treated more favorably than you were because of your -- because of their age?
A. No. I don't go -- I'm not looking into areas like that. I essentially am interested in how I am treated. I mean, I'm not gonna turn around and say, you know, how come you got this and I didn't get that. That's childish. That's not me.
Q. Can you identify any other employees of Bank of America who were discriminated against because of their age?
A. No.

Q. Do you have any reason to believe that Mr. Garofano discriminated against anyone else on the basis of their age?
A. No.
MR. PEZZA: Can you mark this, please.
*(Defendant's Exhibit 21 marked for identification)*
Q. Mr. Vasta, I'm handing you what's been marked as Exhibit 21. Do you recognize this document?
A. Yeah, these are questions to your -- answers to your questions.
Q. Okay. And did you provide the answers to the questions?
A. The ones that -- yes, that I was able to provide, yes.
Q. Okay. And if you look on page 14, is that -- that was the last -- it's the last page. Is that your signature?
A. Yes.
Q. And did you read these before you signed them?
A. What?
Q. Did you read the responses -- the interrogatory responses before you signed that?
A. I wrote the responses.
Q. Could you look at page 12, number 18, please. And the second sentence of your response states, "It is Plaintiff's good-faith belief, as will be borne out

through discovery, that similarly protected individuals have been subject to the same type of treatment, either intentional or arbitrary."

Who are you referring to in your response to interrogatory 18?

A. I have no idea. I was probably referring to -- and I don't remember, that's my problem. Uh --

Q. Well, as you -- I'm sorry to interrupt but as you sit here today, are there -- can you tell me whether there are any similarly protected individuals who were subject to the same type of treatment as you were?

A. Well, treatment as far as -- I know he did not like Chuck Martin, he did not like Jason. They weren't -- they didn't have a medical leave and they -- and they weren't in their sixties, but I think in a way they were discriminated against.

Q. Do you know -- okay. Strike that.

A. That's it, I mean. Maybe what -- forget it.

Q. In this lawsuit, do you claim that Bank of America failed to provide you with a reasonable accommodation for any impairment that you might have?

MR. FANNING: Objection.

A. I don't know what that means.

Q. You've testified that you never asked for an

accommodation from the bank because of your knees, correct?
A. That's correct.
Q. Okay. And never asked for an accommodation because of your shoulder?
A. That's correct.
Q. Okay. So, is there -- so it's fair to say that the bank did not refuse to provide you with an accommodation?
MR. FANNING: Objection.
A. Well, they didn't ask, so, you know.
Q. Did you ask for an accommodation?
A. I did not.
Q. Okay. Now, how did --
*(Phone interruption)*
MR. FANNING: Could you give me one second, please.
MR. PEZZA: Let's go off the record, please.
*(Off the record)*
MR. PEZZA: Back on the record.
Q. Mr. Vasta, you testified earlier that you had a handicapped sticker for your car?
A. That's correct.
Q. And when did -- do you still have that sticker?
A. No.

anybody.
Q. Okay. You testified earlier about some accounts that were not on your account list when you returned. Do you recall?
A. Yes.
Q. Are you -- do you know whether the missing accounts are -- were still Bank of America clients at the time?
A. When I came back, no, I did not know that.
Q. Did you try and call any of those clients?
A. No.
Q. Why not?
A. Because they weren't on my account list. And if they were taken over by another broker, then it would create all kinds of problems.
Q. For any of those clients, did you speak with the broker that had been dealing with them?
A. I don't know who was dealing with them.
Q. Did you ever try to find out?
A. No.
Q. Did you ever talk to Mr. Garofano about the missing clients?
A. Nope.
Q. Why did you leave your laptop computer in the office when you were working at home?

A. Because I had no use for it when I -- outside of the office.
Q. Jane Stich, your former customer, she -- you worked on her account alongside Krista Snyder, correct?
A. Right.
Q. And Ms. Stich was a customer of the bank before you joined Quick & Reilly; is that correct?
A. I don't know. I think so, I don't know. I met her at the North Kingstown branch, but I would imagine so, I have no idea.
Q. Okay.
A. Quick & Reilly or the bank?
Q. I'm sorry, of Quick & Reilly.
A. I think she did have an account at Quick & Reilly.
Q. Okay. And that was with your predecessor, Peter Moretto(phonetic)?
A. Right.
Q. Okay. Did you ever have a meeting with Krista Snyder, yourself and Ms. Stich?
A. Yes, I did.
Q. How many meetings did you have?
A. We had one and it was an absolute disaster.
Q. In what way?
A. I had -- now Jane had 400,000 or 500,000 in cash, and

in this lawsuit in addition to having -- being prosecuted claims as well; do you understand that?
A. I think so, yes.
Q. Okay.
MR. PEZZA: Could you mark that, please.
*(Defendant's Exhibit 22 marked for identification)*
Q. Mr. Vasta, I'm handing you what's been marked as Exhibit 22. Could you please take a moment to review that.
*(Witness perusing document)*
Q. So, Mr. Vasta, you've had a chance to review Exhibit 22?
A. Mm-hmm, yes.
Q. And what is Exhibit 22?
A. It looks like it's a commission run. No, it's a pay stub, I think.
Q. Pay stub -- your pay stubs?
A. Yeah.
Q. Okay. And what is the -- and in this -- these are -- if you can tell, what is the date range of these pay stubs?
A. 5/13, I think it is, through --
MR. FANNING: Where do you see that?
A. It's very hard to find. Until 11/30.
Q. Okay. Is it fair to say that each page of Exhibit 22

roughly follows the same format?
A. Yes.
Q. And these are all for the year 2005, correct?
A. Yes.
Q. May -- starting from May 1st of '05 through November 30th of '05?
A. It's May 13 -- oh, yeah, okay.
Q. Okay? Is that fair to say, May 1st of '05 through --
A. Right.
Q. -- November 30th?
A. Mm-hmm.
Q. Okay. And can you please -- if I could draw your attention to the top left portion of each page, do you see there's a column on the left-hand -- or an indication on the left-hand side for draw?
A. Mm-hmm.
Q. Okay. And do you see where, on the first page of Exhibit 22, it says draw -- the current draw was $1,000?
A. That's right.
Q. Okay. You flip to the next page, which would be the second paycheck in May, again a thousand dollars?
A. Yup.
Q. So on -- a thousand dollars for each paycheck through the July 15, 2005 paycheck, which is -- has -- which is

designated as page 106?
A. Right.
Q. So there's a thousand dollar draw reflected for each paycheck from May -- the beginning of May through the first paycheck in July; is that correct?
A. Yup.
Q. And you received two paychecks per month; is that right?
A. Yeah, but this is when I was on disability so I don't -- see this is what I don't understand. I was getting a -- MetLife pays their -- the disability. That's who they have the policy with. But they do it through the payroll department. So I really don't know why I was being charged a draw when I was on disability from -- from -- starting on -- I was on disability starting on -- okay, starting on this paycheck from 6 -- 6/01 to -- right through September.
Q. Okay.
A. So why am I being charged a draw when I'm on disability?
Q. Is it your understanding that -- you say -- well, what do you mean when you say you were charged a draw?
A. Well, it's showing here that I'm getting -- I was getting a thousand dollar draw. I wasn't here, I wasn't working, I was on medical leave.
Q. Okay.

A. What I was getting was a check that was coming through payroll but it was generated from the short-term disability policy that MetLife has with Bank of America.
Q. Okay. So, but you -- but you did, however, receive these thousand dollar payments, correct?
A. They were being direct deposited. It was -- to my checking account, so I have no idea.
Q. Okay. But these are your pay stubs, correct?
A. Well, yeah.
Q. You have --
A. My name's on it, yeah.
Q. Do you have any reason to think that you were -- that these were not being direct deposited as had happened previously?
A. Yeah, but my question is, this should not appear as against my draw.
Q. My -- I understand. I understand your -- what you're saying. My question, however, isn't whether you should have been receiving the draw or whether the bank should have given you the draw. My question is were -- did you -- do you have -- strike that. Did you receive the draw as indicated on these paychecks?
MR. FANNING: Objection, objection. Go ahead, Joe.

A. It says Bank of Newport so I guess it was deposited.
Q. Okay, so you have no way to dispute that you did receive these payments?
A. Right.
Q. Okay. And if you could look at the second paycheck for July, which is number 1 -- page number 107. And was there any draw paid --
A. No.
Q. -- in that month?

MR. FANNING: Objection. I'm just objecting because he's already said it's not a draw. I object to the use of the -- the continuous use of the word draw. He was getting disability benefits, he wasn't -- I don't care what they call it here or what they list it under, but I just want to make sure the record's clear, Mr. Vasta is not agreeing that he was receiving a draw.

MR. PEZZA: Mr. Fanning, with all due respect, I'm simply pointing out and asking Mr. Vasta questions concerning the indication on these pay stubs concerning draw. If you would -- there is also other designations on these pay stubs that refer to other forms of payment. I'm only asking about draw.

MR. FANNING: Then I want to make sure I'm clear. I understand his answer to be he didn't get any

draw, he got -- where it indicates he got a draw, he was getting disability payments, not a draw as is currently understood in that position. It was not a draw, it was a disability payments. I'm happy to have you ask any questions you want, but I want to make sure that his answer is being understood. Or am I incorrect?

THE WITNESS: Right, I don't understand why I was being charged a draw when I was getting disability.

MR. PEZZA: Can we go off the record, please.

*(Discussion off the record)*

BY MR. PEZZA:

Q. Mr. Vasta, can you please turn to page 107.

A. Yup.

Q. In the -- was there any draw -- is there any draw indicated being paid in the July 29th pay run?

A. No.

Q. Is there any -- if you turn to page 108, is there any draw indicated as being paid in the August 31, 2005 pay run?

A. No.

MR. FANNING: Your answer? Did you say no?

A. No, no.

Q. On page 109, this is September 1st pay run, any draw -- any draw paid there?

A. No.
Q. And now page 110, September 30th pay run, is there a draw --
A. Yes.
Q. -- paid there? And you -- do you dispute that that draw was deposited into your bank account?
A. No.
Q. Page 111, 112, 113, 114 --
A. Right.
Q. -- is there an indication as to whether a draw was paid for those pay stubs?
A. A draw was paid.
Q. Do you dispute that the indicated amount was deposited into your Bank of Newport bank account?
A. No, I don't dispute.
Q. Okay. Mr. Vasta, what fringe benefits did you receive from Bank of America?
A. What do you mean, health insurance, stuff --
Q. I'll ask one by one. Did you receive any health insurance from Bank of America?
A. No.
Q. Any dental insurance?
A. No.
Q. Did you -- were you offered participation in a 401(K) or

Exhibit 23. Can you please review that.
*(Witness perusing document)*
A. Yeah, I know this letter. Yeah.
Q. Okay. What's the date on this letter?
A. October 25.
Q. Of what year?
A. '05. This was not my conversation with DiNovella.
Q. What --
A. There was -- if I -- what was the name of it. Rockland Trust. I don't know if it was Rockland Trust or -- they had an opening on the Cape. They had like ten branches on the Cape and they were looking for someone. So then I applied, and then we had some issues with the compliance department of IFMG and I never proceeded with that.
Q. Mr. Vasta, do you recall a few minutes ago when you testified that you did not look for employment prior to your departure from Bank of America?
A. I went -- you know, we're going now almost two years. You know.
Q. Mr. Vasta, could you answer my question, please.
A. Did I -- yes, I said I did not.
Q. Is that true?
A. Well, obviously it isn't. If you had this letter dated

Q. Yeah, I'm looking for prior to Bank of America.
A. No. Not that I recall.
Q. So, not that you recall. Did -- did you?
A. I told you, not that -- I don't recall.
Q. Were you actively looking for employment elsewhere prior to your departure from Bank of America?
A. Actively, no.
Q. Okay.
A. But I was keeping my ear to the ground, put it to you that way.
Q. Okay. And what -- what was the reason given for your not being offered a position with IFMG in October 2005?
A. It's right here in the letter.
Q. What was your understanding of the reason that they didn't offer you a position?
A. Well, there was a -- there was a whole --
MR. FANNING: Objection.
A. The -- actually, the thing that was the most serious thing was this -- the use of Airborne. I had gotten an emergency phone call from my son and I had to send him money down in Kansas. And it was like 7:00 at night and I used to have to stop at my house because I used to do all my paperwork from there. And I crossed out the address and I put the address he was at; and when it got