# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| JOSEPH VASTA,<br><br>Plaintiff,<br><br>v.<br><br>BANC OF AMERICA INVESTMENT SERVICES, INC.,<br>Defendant. | C.A. No.: 06-396-ML-DLM |

**AFFIDAVIT OF LOUIS GAROFANO**

I, Louis A. Garofano, hereby depose and state the following, based on my own personal knowledge:

1. My name is Louis A. Garofano. I am over 21 years of age and am a resident of the State of Colorado. I was employed by Banc of America Investments, Inc. ("BAI") from January 1993 through June 15, 2007.

2. During the period of July 15, 2005 through June 15, 2007, I held the position of Senior Vice President - Investments and Rhode Island Market Director for BAI. In this capacity I was Plaintiff Joseph Vasta's direct supervisor from July 15, 2005 until his separation from employment with BAI on November 15, 2005.

3. BAI merged with Quick & Reilly in or around April of 2004, but all phases of the transition to the BAI platform in the Rhode Island Market were not completed until June of 2005.

4. Bank of America eliminated the program in which banking center associates were provided with incentives to make referrals to financial advisors like Vasta.

5. In the Fall of 2004, Bank of America instituted a program in which the financial advisors would partner with "Premier Bankers" with the goal of cross-selling banking products and providing an increased level of service to Bank of America's customers.

6. Following implementation of the Premier Banking Program, financial advisors were focused on capturing a greater share of the mass affluent market (individuals with $100,000 to $3 million to invest); in turn, the emphasis on branch referrals was diminished.

7. Along with the new, full-service BAI platform came new computer systems – which included, among other things, online research tools and investment recommendation guidance that was updated daily – and a new investment analysis tool called "Perspectives on Planning."

8. In or around June 2005, BAI implemented the remaining changes required to fully convert the legacy Quick & Reilly systems to the full-service BAI platform.

9. In the midst of this transition, BAI assigned me to head the Rhode Island Market.

10. At the time of my transfer I had been working for BAI as Sales Manager in Scottsdale, Arizona.

11. The Arizona Market had been using the full-service BAI platform since its inception.

12. BAI continued to train its financial advisors on the Perspectives on Planning tool and the other new BAI systems throughout the summer of 2005.

13. The changes resulting from the conversion to BAI systems were market-wide and affected all financial advisors in the same manner.

14. In early August 2005, I began the process of assigning broker Stuart Latessa ("Latessa"), to cover Vasta's branches and customers during Vasta's leave.

15. By late August or early September, Latessa, who had been working in a different market, was transferred to the Rhode Island Market, provided with a list of Vasta's customers and was assigned to cover the North Kingstown and Bald Hill Road banking centers.

16. Market Administrative Assistant Caryn Hodges ("Hodges") scheduled a meeting for September 6, 2005 at which I could meet Vasta, who had been away on leave since before I transferred to the Rhode Island Market.

17. Hodges later rescheduled the meeting at my request to September 8, 2005 due to the death of a family friend.

18. During the September 8 meeting, I informed Vasta that he should have returned to work on September 1 and asked him whether he had yet contacted MetLife to discuss his return to work.

19. I then explained BAI's mission and new platform to Vasta.

20. In response to Vasta's inquiry about why his customers had been reassigned, I informed him that they had simply been covered by another broker in his absence.

21. BAI reinstated Vasta to the position of financial advisor in the Rhode Island Market.

22. Because it was the same position, it encompassed the same duties and responsibilities and required the same skill and professional licensure as it did prior to Vasta's leave.

23. Vasta's reporting structure did not change upon his return from leave – Vasta still reported to the Rhode Island Market Director.

24. Notwithstanding Latessa's transfer, BAI reassigned Vasta's former client list to him upon his return.

25. At the time of Vasta's return from leave, I was aware that his production prior to his leave had been extremely low.

26. In light of Vasta's low production and need to get up to speed on the BAI systems, I assigned him to work out of the Rhode Island Market's main office in Providence.

27. Not only did both Hodges and I work out of the Providence office, but so did all but one of the market's sales assistants, and more brokers were assigned there than any other location.

28. BAI had dozens of on-line, self-directed training modules that were available to its brokers.

29. Before he told me on November 15, 2005, I was not aware that Vasta was supposedly working from home.

30. No other brokers in the Rhode Island market worked from their homes.

31. By early November 2005, I took note that I had not seen Vasta in the office for some time.

32. On November 10, I called Vasta's work telephone number and found that Vasta had not set up his outgoing voicemail message, even though he had returned to work nearly two months earlier.

33. I asked Hodges to review records of Vasta's customer transactions, and learned that he had recorded fewer than 10 total transactions following his return from leave.

34. I also took note that Vasta's BAI laptop remained in the Providence office from at least November 10 through 15 and that I did not see him in the office during that timeframe.

35. BAI instructed financial advisors to record all interactions with customers on the IRIS system.

36. On November 15, Hodges and I called Bank of America's Advice & Counsel department and explained Vasta's failure to attend an October 18 Perspectives on Planning workshop, his

extended absence from the office, our inability to contact him through his BAI telephone number and his failure to set up his voicemail.

37. Later that morning, I reached Vasta on his cell phone and informed him that his employment was separated as of November 15, 2005.

38. Hodges played no role in BAI's decision to separate Vasta from his employment due to job abandonment.

I SOLEMNLY AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.

Dated: 10/5/2007

Louis A. Garofano